(36 Misc. Rep. 233.)

SWANN et al. v. BAXTER et al.

(Supreme Court, Special Term, New York County. November, 1901.)

1. PLEDGE—SALE OF COLLATERALS—REDEMPTION.

A firm made large loans on stock under an agreement with the bor-
rower that he should maintain a margin of 5 per cent. on the par value
of the stock. It sold the stock a year thereafter because it had de-
clined in value, and the borrower had put up no additional margin. The
borrower had also given authority to sell one-half of his stock, to apply
on the loan. *Held*, that he could not redeem from the sale, because made
without notice, where he was unable to accept the subsequent offer of

the firm to buy it back at the prevailing price when he discovered the sale, if he furnished the required margin.

**2. SAME—LACHES.**

Where collaterals were sold, the pledgee, to redeem, must tender his debt within a reasonable time after learning of such sale; and a tender of payment after sale, and after the collaterals had largely advanced in value, is too late.

Action by James Swann and Bernard S. Clark against Nathaniel Baxter and others, executors of John H. Inman, deceased, to obtain a statement of a partnership account on a sale of collaterals held by them as security for a debt. Judgment rendered.

John E. Parsons, for plaintiffs.

Sullivan & Cromwell (Robert F. Jackson, Edmund Baxter, William J. Curtis, Edward B. Hill, and Francis D. Pollak, of counsel), for defendants.

LAWRENCE, J. I am satisfied from the evidence that under the terms of Exhibit L, which bears date September 13, 1895, and which must be read in connection with the original agreement between the parties, dated October 31, 1894, the plaintiffs had the right to require the defendants to keep and maintain in their hands a margin of at least 5 per cent. on the par value of any stocks, bonds, or gold which they might have in their possession, belonging to deceased. The criticism which is made by defendants' counsel, that the securities which were received and held under the agreement of renewal made on the 13th of September, 1895, at the time the five notes, amounting to $228,330.60, were given, had not been bought or sold by the plaintiffs, cannot be regarded as a just criticism, for the reason that Exhibit L refers to all transactions which are open, as well as those into which the parties might enter, and it is not established by the evidence that there were any other transactions then open between the parties. The testimony of the defendant that he knew of negotiations pending between the Tennessee Coal, Iron & Railroad Company and the Sloss Iron & Steel Company which might have the effect of raising the price of the former company's stock, and that he contemplated buying more of the shares of that company through Inman, Swann & Co., and signed Exhibit L as an agreement to cover such purpose on the same day, but before the notes were given, is directly contradicted by Mr. Clark, and substantially by Mr. Swann; and, as the only transaction then open was the transaction represented by the notes and the collateral which had been given in relation to them, I must hold, as a matter of fact, that Exhibit L related to it, as well as to any transaction which might be had between the parties in the future. It follows, therefore, that the plaintiffs were entitled to sell the Tennessee Coal, Iron & Railroad Company's stock when the security fell below 5 per cent. on the par of the stock, unless there was some other agreement altering the relations of the parties. It is conceded that the 5,600 shares of the Tennessee stock were of the par value of $560,000. The stock was valued at the time the notes were made at $43 per share. It had declined, according to the testimony, to about $20 per share, at which valuation a further

and much larger margin was to be supplied by Mr. Baxter; and, if it was not furnished by him, the plaintiffs had the right, under Exhibit L, to sell the stock, if, in their judgment, and for their protection, they deemed it proper to do so. Had the relations of the parties been altered? The verbal agreement alleged to have been made by Inman, Swann & Co. in May, 1896, to carry the defendant's stock in consideration that he would go to Birmingham and take care of the debt due to them from the company, and that they would carry his stocks in the meantime, is not, in my opinion, substantiated. Apart from the fact that it seems a most peculiar agreement for the plaintiffs to have made, the testimony of the defendant in regard to it is contradicted by the member of the firm (Mr. Swann) with whom it is alleged to have been made; and it was the duty of the defendant, irrespective of any agreement, as the president of the company, to have applied himself to the discharge of its debts, and, if it was necessary for him to go to Birmingham for that purpose, he was bound to do so. Furthermore, as is well known, and as was stated substantially by witnesses upon the trial, the condition of the country at that time, financially, was such that it would seem to be most improbable that prudent business men would have entered into such an arrangement. The action of the defendant subsequent to the notice of sale contained in the letter of September 4, 1896, seems to me to be inconsistent with the claim on his part that the plaintiffs were not authorized to sell the Tennessee Coal, Iron & Railroad Company's stock because of its declining price, and of his neglect to furnish further margin without notice, under the terms of Exhibit L. See letters of April 6, 1897, and June 28, 1897. Nor do I think that the defendant's claim that he went to the office of the plaintiffs, and stated to Clark that he had made arrangements through other brokers to take up the notes which were delivered on the 13th of September, 1895, has been proven. On this point he is contradicted by Clark; but, conceding such to have been the fact, it throws no light upon the subject of this controversy. The fact remains that the matter was continued as an "open transaction" between the parties. It was governed by the terms and conditions then agreed upon, including those contained in Exhibit L. Independently of the authority conferred by Exhibit L it appears that on the 14th of December, 1895, the defendant wrote to the plaintiffs as follows:

"New York, December 14, 1895.

"Messrs. Inman, Swann & Company, New York—Dear Sirs: Referring to your loans made on 5,600 shares T. C., I. & R. R. Co. stock, you are hereby authorized to sell at your discretion 2,800 shares of the stock, and apply proceeds towards the payment of the loan.

"Yours truly,                Nathaniel Baxter, Jr."

See Exhibit A, 11.

Here was a specific authority given to sell one-half of the stock, in addition to that which was contained in Exhibit L, before referred to. It also appears that on the 14th of August, 1895, before the renewal notes were given, the defendant had authorized the plaintiffs to release 3,000 shares from the agreement of 1894, and to sell them, in their discretion. This was not acted on by the plain-

tiffs; but the letter goes to show the relations which existed be-tween the parties, and that Mr. Baxter understood that he was un-der great obligations to them for carrying the stock as long as they had. It is also valuable as showing his financial condition at that time, and his inability to take up the loan through the instru-mentality of other parties.

Upon all the evidence, it seems to me that the defendant can-not assert that he has been injured by the action which the plain-tiffs took in regard to the Tennessee stock. If his letters of April 6, 1897, and June 28, 1897, are not to be regarded as an abandon-ment by him of the position that the plaintiffs had no legal right to sell the stock, it is perfectly apparent that he cannot claim that the plaintiffs should have done any more than buy back the stock for him at the price which prevailed when, as he claims, he first dis-covered that the sale had been improperly made. If they had bought it back, I find, on the evidence, they would have had the right to sell it again, unless he increased his margin, which, on the testimony, he appears to have been unable to do. The lowest price of the stock in October, 1897, was 25⅜; the highest, 32½. In November the lowest price was 22¼; the highest, 26⅞. In December the lowest price was 24½; the highest, 26¾. In January, 1898, the low-est price was 23⅜; the highest, 28½. In February the lowest price was 19; the highest, 25⅞. In March the lowest price was 17; the highest, 22¼. In April the lowest price was 18⅜; the highest, 21½. If he had intended to insist that he had been injured by the plain-tiffs, and that he was entitled to the return of his stock, he should have made his tender, assuming that a legal tender was made, with-in a reasonable time after he ascertained the fact, which, as he claimed, entitled him to a return of the stock. In other words, he could not defer his demand and tender until May 12, 1899, after the suit was commenced, and 19 months after he had learned the fact, and after his other collateral, the Nashville Street Railway shares, had so far increased in value as to amount to $174,000, and then claim that he was entitled to reclaim the stock at the price at which it was then selling, or compel the plaintiffs to replace it at that time. Nor do I think that the cases cited by the defendants' counsel sustain the position that a tender could be made at an in-definite length of time after the party has ascertained the facts. In Ganley v. Bank, 98 N. Y. 487, which is cited as directly in point by the defendants' counsel, it did not appear that the decedent ever became aware of the fact that the certificate had been sold. Her administrator found the certificate among her effects, and the dam-age which was recovered was the amount of the notes, with interest from the date of the demand. In that case the administrator made his demand in July, 1879, shortly after discovering the facts; the receipt of the defendant having been given in April, 1865. So, too, in the case of Hopper v. Smith, 63 How. Prac. 34, the alleged wrong-ful sale of the receiver's certificate took place in March, 1878; and although the demand was made in December, 1879, it does not ap-pear when the plaintiff discovered that the certificate had been il-legally sold. None of these cases, as I understand them, go to the

length of holding that a party can wait as long as he pleases after his discovery of the facts before making a demand for a return of the stock, and a tender of the full amount due from him to his pledgee. It will be perceived from the statement of the prices intermediate October, 1897, and March, 1898, that the stock could have been replaced by the plaintiffs at a small loss, if any, or even at a profit, if the defendants' demand had been made upon them within a reasonable time,—say, within six months after the sale. Then, if my view of the evidence is correct, it would have been the plaintiffs' right to have immediately resold the stock, as there was no agreement upon their part to carry it for the defendant for any further time. I think that it is a fair and just inference from the testimony that the defendant was unwilling to have the stock repurchased unless the plaintiffs were willing to carry it for him without further margin than the securities which remained in their hands after the sale; and this I find the plaintiffs had, throughout the negotiations and in the interviews subsequent to the sale, steadily refused to do.

The error in crediting the 2,200 shares to the special account of John H. Inman is, I think, fairly and fully explained by the testimony of the plaintiffs; and the fact that the sales notes were made out by the brokers who made the sales in the name of John H. Inman is not inconsistent with the plaintiffs' position, for the reason that, when one broker employs another to make a sale for a customer of the former, I do not understand it is customary to reveal the name of such customer. The transaction is one between the employing and the acting broker.

Finally, I am of the opinion that the plaintiffs had a right to sell the stock which they held as collateral under the agreement of September 13, 1895 (Exhibit L), and as to one-half of said stock, under the special authority given by the letter of December 14, 1895, that, even if such sales were unauthorized, the defendant is not shown to have been damaged, for the reason that he did not offer to increase his margin if the stock should be repurchased, and the plaintiffs were under no obligation and made no promise to carry the stock for him in the absence of such increase; that when he was informed of the facts, in October, 1897, if he intended to insist that the sales in question were illegally made, he should have tendered the amount which was due on the notes, principal and interest, within a reasonable time, and that the alleged tender on the 12th of May, 1899, was not made within a reasonable time after such discovery; and that the defendant is estopped by the position which he has taken after learning the facts from disputing that the stock was sold.

It is conceded by the defendants' counsel that the only real dispute was as to the alleged sale of 5,500 shares of the Tennessee stock, 100 shares being admitted to have been properly sold; and it is admitted by the answer that on December 1, 1897, the amount due upon the notes, with interest, was $268,821.12. The amount realized from the sale of the stock, with interest to December 1, 1897, was $118,534.15, for which the plaintiffs credited the defendant, leaving the amount due to the plaintiffs on that day the sum of $150,286-

97, for which sum, with interest from that date, the defendants are indebted to the plaintiffs. It is also conceded that the collaterals which were in the hands of the plaintiffs were pledged as collateral to certain obligations upon which the defendant Baxter was liable. as the maker or indorser of certain promissory notes to the estate of John H. Inman. The judgment will direct that the collaterals remaining in the hands of the plaintiffs be sold, and if, after paying their claim, any surplus remains, it must be applied in satisfaction of the amount due to the estate of John H. Inman. Draw decision and judgment accordingly, and settle on three days' notice.

Judgment accordingly.