Argued March 23, decided April 30, rehearing denied November 15, 1909.

## THOMAS v. GILBERT.

[101 Pac. 393; 104 Pac. 888.]

PLEDGES—SALE OF PLEDGED SECURITIES—PURCHASE BY PLEDGEE.

1. Where a pledgee of property purchases it at a sale made by him, by his authority or under his direction without the pledgor's consent, the sale is voidable, and the pledgee may be required to account for the property and deliver it on payment of the debt. The incapacity of the pledgee to purchase at his own sale applies to a general partner of a firm holding the property in pledge.

PLEDGES—SALE OF PLEDGE—PARAMOUNT LIEN—PURCHASE BY PLEDGEE —VALIDITY.

2. Purchase of pledged property by the pledgee at a public auction under a paramount lien is only voidable and may be ratified by the pledgor's accepting the proceeds of the sale as a credit on the indebtedness with full knowledge of the facts.

BANKS AND BANKING—NATIONAL BANKS—IMPAIRMENT OF CAPITAL— DECISION OF THE COMPTROLLER.

3. The decision of the Comptroller of the Currency that the capital stock of a national bank is impaired is conclusive on the stockholders of the bank and on the courts; the bank having no alternative but to make good the impairment or liquidate.

Pledges—Sale of Pledged Securities—Purchase by Pledgee—Ratifi-
    cation—Rights of Creditors—Laches.

4. When a receiver was appointed for an insolvent, certain national
bank stock belonging to him was pledged for an indebtedness. The
capital of the bank had been impaired, and the Comptroller had ordered
its restoration requiring an assessment of 60 per cent., or that the bank
close.     An assessment was levied, which was a paramount lien on the
stock, whereupon the pledgor's receiver applied for instructions as to
whether he should pay the assessment, and was directed not to do so.
The stock was thereupon sold for nonpayment of the assessment and
purchased individually by one of the general partners of the pledgee firm,
who thereupon successfully managed the bank until within five years
the stock became worth $150 a share.     The pledgees the next year after
the sale offered to pay the receiver $600 for a transfer of all the pledgor's
equity in the pledged securities, which offer the receiver at the court's·
direction accepted, and four years thereafter the insolvent's general
creditors applied to compel the purchaser to transfer the stock to the
receiver on the ground that the sale was void.     *Held,* that the creditors
having made no attempt to repudiate the transaction for five years,
and the receiver representing the pledgor and creditors having acquiesced
therein, there being no fraud in the sale, it was not subject to vacation.

Banks and Banking—National Banks—Assessment to Restore
    Impaired Capital—Requisites.

5. Rev. St. U. S. § 5205 (U. S. Comp. St. 1901, p. 3495), requiring
every national banking association whose capital is impaired to pay,
within three months after notice from the Comptroller of the Currency,
the deficiency in the capital by assessment on the shareholders, and
providing that, if any shareholder neglects to pay after three months'
notice, his stock shall be sold after 30 days' notice, etc., gives the share-
holders three months in which to pay an assessment to restore impaired
capital, and the three months' time must elapse, accompanied by a
neglect to pay, before a sale of the stock can be legally ordered.     (Per Mr.
Justice King, dissenting.)

Banks and Banking—National Banks—Assessment to Restore
    Impaired Capital—Requisites.

6. The three months' time prescribed by Rev. St. U. S. § 5205 (U. S.
Comp. St. 1901, p. 3495), before the making of an order for the sale of
national bank stock for nonpayment of an assessment to restore impaired
capital, is a jurisdictional prerequisite, and a sale made pusuant to an
order made before the expiration of the three months' time is absolutely
void, and the inadequacy of the notice of assessment is not a mere
irregularity, which may be waived, or to which laches may apply.
(Per Mr. Justice King, dissenting.)

Courts—Jurisdiction of Person.

7. The time required to give jurisdiction of a nonresident and sale of
attached property under judgment procured thereby, or to give a right
to any officer or tribunal to make an order for a sale under either of these
circumstances, is a jurisdictional matter.     (Per Mr. Justice King, dis-
senting.)

Banks and Banking—National Bank Stock—Assessments—Sales
    for Nonpayment—Validity.

8. Where a sale of national bank stock for nonpayment of an assess-
ment is void because of the insufficiency of the notice of the assess-

ment essential under Rev. St. U. S. § 5205 (U. S. Comp. St. 1901, p. 3495), to the jurisdiction to order the sale, no title passes at the sale, and nothing on which laches may operate or cure, and nothing in which to acquiesce or ratify. (Per Mr. Justice King, dissenting.)

BANKS AND BANKING—NATIONAL BANK STOCK—ASSESSMENT—SALES FOR NONPAYMENT—VALIDITY.

9. Where a sale to the pledgee of national bank stock for nonpayment of an assessment to restore impaired capital was void, because of the inadequacy of the notice of assessment, laches in instituting a suit to avoid the sale by the receiver of the insolvent pledgor or his creditors could not begin to run until after the claim of the pledgee had been satisfied in full. (Per Mr. Justice King, dissenting.)

BANKS AND BANKING—NATIONAL BANK STOCK—ASSESSMENT—SALES FOR NONPAYMENT—VALIDITY.

10. In 1901 pledged national bank stock was sold to the pledgee for nonpayment of an assessment to restore impaired capital. The sale was void because of the inadequacy of the notice of the assessment. The pledgor was insolvent, and in 1902 the pledgee presented to the pledgor's receiver a verified claim for the balance due. The claim recited that the stock had been sold and that the pledgee had received nothing therefor. The pledgee's claim was satisfied in full in 1905. Seven months thereafter a petition was filed to avoid the sale. There was nothing to show that the pledgee claimed to own the stock in his individual right by reason of his purchase, or that he claimed it at all except as collateral. The pledgee incurred no additional expense by reason of the purchase. *Held,* that the petition to avoid the sale was maintainable against the objection of waiver, laches, or ratification of the sale of the stock, or acquisence in the sale. (Per Mr. Justice King, dissenting.)

From Marion: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by Roscoe C. Thomas, substituted executor of the will of William Cosper, deceased, against A. T. Gilbert and others. On petition of the Schaeffer Piano Company and others for a decree requiring the defendants, Ladd & Bush, to transfer to Claud Gatch, receiver of A. T. Gilbert, certain stock previously owned by Gilbert in the First National Bank of Moscow, Idaho, a decree was rendered as prayed for and Ladd & Bush appeal.

In April, 1901, A. T. Gilbert, doing business at Salem in this state as a banker, failed, and, in a suit brought against him by plaintiff, Claud Gatch was duly appointed receiver of his property and estate. At the time of his

failure, Gilbert was indebted, in a large amount, to A. Bush and A. N. Bush, partners, doing business as bankers, under the firm name of "Ladd & Bush," for which they held, as security, certain notes and collaterals, including 105 shares of stock owned by Gilbert in the First National Bank of Moscow, Idaho. The Moscow Bank was incorporated under the national banking act, with a capital of $50,000, divided into 500 shares of $100 each. One hundred and sixty-five of these shares stood, on the books of the bank, in the name of Gilbert, 168 were owned by the individual members of the firm of Ladd & Bush, and the remainder by other parties. The bank had, until a short time before Gilbert's failure, been managed by himself and his brother, and when he failed a run was made on it by the depositors, whereupon the cashier telephoned to Ladd & Bush that he would be unable to keep the doors open without assistance, and Ladd & Bush furnished money and credits with which to satisfy the depositors, and the run ceased. The capital stock of the bank, however, had been very much impaired, and on the 6th of May it received notice, from the Comptroller of the Currency, that its capital stock was impaired to the extent of $30,000, and that it would be required to make up such deficiency within three months, or a receiver would be appointed to close its affairs. In pursuance of this notice the board of directors called a meeting of the stockholders for June 15 for the purpose of levying an assessment of 60 per cent on each share of stock, or placing the bank in liquidation. The stockholders were notified of this meeting, and on the day named it was held, 473 shares being represented, either in person or by proxy, at which time it was voted that an assessment of 60 per cent be levied on the shares. Notice of this assessment was duly given to the stockholders, including the receiver; but he neglected to pay the assessment on the stock held by him, and on August

2, 1901, the board of directors of the bank ordered such stock sold at a public auction to satisfy such assessment. The sale was advertised for the 14th of the following September, and on the 11th of the month the receiver presented a petition to the court appointing him, reciting the fact of such assessment and prospective sale, that the shares were held by Ladd & Bush as collateral security, and asking for instruction as to whether he should pay the assessment from the assets on hand belonging to the Gilbert estate or should permit them to be sold.

The oral testimony shows that, after a hearing, the court directed the receiver not to make such payment, although no entry of that kind was made of record. On the 14th the stock was sold at public auction and purchased by Mr. Bush, for the amount of the assessment, that being the highest and best bid offered therefor. The stock held by Ladd & Bush as collateral security was subsequently surrendered to the bank, and new stock issued to Mr. Bush in lieu thereof. Mr. Bush thereupon assumed active control and management of the bank, and its credit and standing were soon restored, and it has paid a dividend, for several years, on the capital stock, and such stock was, at the time of taking the testimony in this proceeding, worth about $150 per share. On the 12th of September, 1902, Ladd & Bush presented to the receiver of Gilbert a verified claim for $12,509.17, the balance then due on their claim against Gilbert, in which it is stated that the stock in the Moscow Bank, which had been pledged to them as collateral security, had been sold for an assessment levied against it, and that Ladd & Bush had received nothing therefor. Dividends were subsequently declared in the Gilbert estate and paid to Ladd & Bush, as well as other creditors, until the 9th of November, 1905, when Ladd & Bush made an offer to the receiver to receipt in full, for the balance due on their claim against the estate, and pay to the receiver

$600 for the equities of the estate in the collateral then held by them, to secure the payment of such claim. The receiver reported this offer to the court and was directed by it to accept the same, and, upon the payment of $600 in money, and a receipt from Ladd & Bush in full for their claim, to sell, assign, and transfer to them all the equities of the estate in and to such collateral, which was done accordingly. Thereafter and on the 20th of June, 1906, certain of the creditors of Gilbert filed a petition, in the receivership proceedings, for a decree requiring Ladd & Bush to assign and transfer to the receiver the stock purchased by Mr. Bush at the sale made by the Moscow Bank and to pay to him the dividends received thereon. The court below rendered a decree as prayed for, and Ladd & Bush appeals.          REVERSED.

For appellants there was a brief with oral arguments by *Mr. George G. Bingham* and *Mr. William P. Lord.*

For respondent there was a brief over the names of *Mr. Tilmon Ford* and *Mr. William M. Kaiser,* with oral arguments by *Mr. Kaiser* and *Mr. Wirt Minor.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. The petitioners claim that the purchase of the stock by Mr. Bush, at the sale made by the Moscow Bank, was void as to the receiver and the creditors of Gilbert, because Ladd & Bush, of which firm he was a member, was, at the time, pledgee of such stock, and therefore neither the firm nor any of its members could purchase the same, and that the sale was invalid on account of irregularities in the proceedings under which it was attempted to be made; but, assuming both of these positions to be sound, we do not think that, under the facts as presented by this record, plaintiffs are entitled to the relief demanded. There is no charge of fraud or unfair dealing by Mr. Bush, or the firm of which he was a member, in the matter of the sale or purchase of the stock. The petitioners rely on the rule of law that prohibits a

pledgee of property from purchasing the pledged property without the consent of the pledgor. Where the pledgee of property purchases the same at a sale made by him, or by his authority, or under his direction, and without the consent of the pledgor, it is void, or at least voidable. It is generally held that nothing passes by such a sale, and that the pledgee still holds the property under his original lien. The title is still in him, and he is liable to account for the property and deliver it upon payment of the debt, and this inability applies to a general partner of a firm holding property in pledge: Jones, Pledges & Collateral Securities, §§ 635, 636; *Bryson* v. *Rayner,* 25 Md. 242 (90 Am. Dec. 69) ; *Bank of Old Dominion* v. *Railroad Co.* 8 Iowa 277 (74 Am. Dec. 302).

2. There is a real or apparent conflict in the authorities as to whether the pledgee of property can purchase the same at a sale made under a paramount lien; but, in any event, if such sale is at a public auction, after notice, it is not void, but only voidable. It may be ratified by the pledgee, and such ratification will be implied from circumstances, as where the pledgor, with full knowledge of the facts, accepts the proceeds of the sale as a credit on the indebtedness, or when the sale is made with his consent and acquiescence: Jones, Pled. & Coll. § 638; *Guinzburg* v. *Downs Co.* 165 Mass. 467 (43 N. E. 195: 52 Am. St. Rep. 525) ; *Downer* v. *Whittier,* 144 Mass. 448 (11 N. E. 585), or where conditions of the pledge or the increase in value of the pledged property have so changed since the sale as to render it inequitable or unjust for the pledgor to be permitted to disaffirm it. And an unreasonable delay after notice of the sale in redeeming the property will be regarded as an affirmance thereof: 22 Ency, 89 note; Jones, Pled. & Coll. §§ 637, 637b; Cook, Stock, § 479; Colebrooke, Coll. § 343; *Carroll* v. *Mullanphy Sav. Bank,* 8 Mo. App. 249; *Swann* v. *Baxter,* 36 Misc. Rep. 233 (73 N. Y. Supp. 336). What

constitutes such a delay will, of course, depend upon the circumstances of each case. Thus, on the sale of pledged mining stock, a delay of two months after being notified of the sale, and until the stock had largely increased in value, was held, in *Hill* v. *Finigan,* 77 Cal. 267 (19 Pac. 494: 11 Am. St. Rep. 279) to be an unreasonable delay as a matter of law, and in *Hayward* v. *National Bank,* 96 U. S. 611 (24 L. Ed. 855) four years was considered to be unreasonable.

3. Now in this case the sale and purchase was not only made with the knowledge and acquiescence of the receiver, who represented the pledgor and his creditors; but there was a delay of almost five years before an attempt was made to repudiate or disaffirm it. In the meantime the stock, which was practically worthless at the time of the sale, had largely increased in value, so that it seems to us it would be inequitable and unjust to permit it now to be disaffirmed or repudiated. The decision of the Comptroller of the Currency, as to the impairment of the capital stock of the Moscow Bank, was conclusive and final on the stockholders and the courts: *Aldrich* v. *Yates* [C. C.] 95 Fed. 80; *Kennedy* v. *Gibson,* 8 Wall. 505 (19 L. Ed. 476); *Casey* v. *Galli,* 94 U. S. 677 (24 L. Ed. 168), and it left no alternative to the bank but to make up the deficiency or go into liquidation. The assessment on the stock was levied by the bank to meet the requirements of the Comptroller. Ladd & Bush, as pledgee, was under no duty to protect the stock from forfeiture or sale for nonpayment of the assessment, but as between them and the pledgor it was the duty of the latter or his representative, the receiver, to pay such assessment: 3 Clark & Marshall, Corp. § 623b, p. 1892. Fraud cannot therefore be fairly imputed to Ladd & Bush because they failed to pay such assessment.

4. The sale of the stock was made in 1901, at public

auction, after due notice and with knowledge and acqui-
escence of the receiver of the pledgor, and of the court
appointing him. At that time the Moscow bank was in
a precarious condition, and the stock was not regarded of
sufficient value, either by the receiver or the court, to
justify the receiver in paying the assessment thereon
from the funds belonging to the estate, thus reducing the
amount which would be for distribution among the cred-
itors. The fact that the sale had been made was reported
to the court by Ladd & Bush in September, 1902, and no
steps were taken by the pledgor or his receiver or any
of the creditors to redeem the pledged property or repudi-
ate or disaffirm the sale. On the contrary, almost four
years thereafter the receiver was authorized and directed
by the court appointing him to settle and compromise
the claim of Ladd & Bush against the estate, and to assign
and transfer to them the equities of the estate in the
collateral on the delivery to him by Ladd & Bush of a
receipt in full for their claim and the payment of $600
in money. It is true the stock was not specificially
included in this settlement, but it was made with full
knowledge that the stock had been purchased by Mr.
Bush and without asserting any claim thereto, thus sub-
stantially ratifying and affirming the purchase and sur-
rendering all right the estate had against Ladd & Bush
on account of such stock. It was not until after this
settlement, and after the stock had, under the manage-
ment of Mr. Bush and his associates, largely increased
in value, that an attempt was made by any one to assert
any claim thereto or contend that the sale was not valid.
It may be true that all the creditors of the Gilbert estate
did not have notice or knowledge of the purchase of the
stock by Mr. Bush, or the circumstances under which
such purchase was made; but the receiver, who repre-
sented the pledgor, as well as his creditors, and the court
appointing him, were advised in the premises, and their

act in acquiescing in and, in effect, ratifying and affirming the sale by subsequently settling with Ladd & Bush, is binding and conclusive upon all parties interested in the estate.

It follows from these views that the decree of the lower court should be reversed, and the petition dismissed.                                                    REVERSED.

Mr. Justice SLATER, being one of the petitioners, did not sit in this case nor take any part in its decision.

Decided November 15, 1909.

## ON PETITION FOR REHEARING.

[104 Pac. 888.]

PER CURIAM: Rehearing denied.

Mr. Justice KING delivered the following dissenting opinion:

At the time of the filing of the opinion in this case, I entertained grave doubts as to the soundness of the conclusion announced, and since the receipt of the petition for rehearing I have carefully re-examined the record, and into the legal principles involved, with the result that I am fully convinced that the conclusion reached by the majority, as disclosed by the opinion, is erroneous, and, if permitted to stand, will necessarily result in the taking of property by appellants without due process of law, in violation of the provisions of section 10 of our Bill of Rights and in contravention of the federal constitution. I therefore feel impelled to record my dissent, and to give in part, at least, my reasons therefor.

5. The determination reached by the majority, as I view it, is based largely upon an inaccurate assumption of facts. In the outset it is assumed that, in making the sale under the assessment levied, "notice of this

assessment was duly given to the stockholders, including the receiver; but he neglected to pay the assessment on the stock held by him, and on August 2, 1901, the board of directors of the bank ordered such stock sold at a public auction to satisfy such assessment." It was my impression during our former consideration of the case that there was no question as to the time having passed which was required before a sale of stock to pay assessments could be declared. I find, however, from an inspection of the record, that under the conceded facts this required time had not elapsed before the sale was ordered, and that under no system of calculation can it be so held. It cannot be legally held that "due notice" was given, where the order for the sale was made before the expiration of the time prescribed by the statute, unless it be on the theory that such prerequisite is not jurisdictional, and that the requirements are directory, and not mandatory.

Section 5205, Rev. St. 5 Fed. St. Ann. p. 143 (U. S. Comp. St. 1901, p. 3495), reads as follows:

"Every association which shall have failed to pay up its capital stock, as required by law, and every association whose capital stock shall have become impaired by losses or otherwise, shall, within three months after receiving notice thereof from the Comptroller of the Currency, pay the deficiency in the capital stock, by assessment upon the shareholders *pro rata* for the amount of capital stock held by each; and the treasurer of the United States shall withold the interest upon all bonds held by him in trust for any such association, upon notification from the Comptroller of the Currency, until otherwise notified by him. If any such association shall fail to pay up its capital stock, and shall refuse to go into liquidation, as provided by law, for three months after receiving notice from the Comptroller, a receiver may be appointed to close up the business of the association, according to the provisions of section 5234; *and provided*, that if any shareholder or shareholders of such bank shall neglect or refuse, after three months' notice, to pay

the assessment, as provided in this section, it shall be the duty of the board of directors to cause a sufficient amount of the capital stock of such shareholder or shareholders to be sold at public auction (after thirty days' notice shall be given by posting such notice of sale in the office of the bank, and by publishing such notice in a newspaper of the · city or town in which the bank is located, or in a newspaper published nearest thereto), to make good the deficiency, and the balance, if any, shall be returned to such delinquent shareholder or shareholders."

That part of the above section after the words "and provided" was adopted June 30, 1876 ,(19 Stat. 64, c. 156, § 4), as amendatory of section 5205 as it was at that time, which section, prior to the amendment, did not provide any power to sell delinquent stock, to cure which defect this amendment was evidently adopted.

It is well also to bear in mind that the section as originally passed must be construed in connection with this amendment, which makes it impossible in all cases to comply with the provision to the effect that the deficiency be paid within three months from receipt of notice from the Comptroller, as indicated in the act before the 1876 amendment. It is obvious, therefore, that the three months' notice to pay the assessment must have reference when applied to this case, to the time after June 15, 1901, when the assessment was made. It will be observed that the amendment requires that the shareholders be given three months' notice to pay the assessment, after which an order may be made for the sale of stock to meet such assessment, and such sale had after thirty days' additional notice. The first requirement appears to be that the association within three months after notice from the Comptroller, pay the deficiency to which attention may be called; and in case of such failure, if they refuse to go into liquidation, a receiver shall be appointed. It is evident that the banking corporation

may avoid going into liquidation by the levying of an assessment to meet the deficiency. It is also clear that the corporation may levy an assessment for this purpose; and it is equally obvious that after such levy the shareholders must have three months in which to pay it, and that the three months' time must elapse, accompanied by a refusal or neglect to pay, before a sale of the stock can be legally ordered.

The Comptroller's notice was received by the bank at Moscow on May 6, 1901, and the directors' meeting, at which the shareholders were notified of the receipt of such notice from the Comptroller, was held on May 15 following, at which time the directors undertook to notify the stockholders to meet on June 15, 1901, at Moscow, for the purpose of providing for the payment of the deficiency of the capital stock by assessment. At this time, June 15, the assessment under which the stock was subsequently sold was made, the levy thereon being 60 per cent upon all the shares of the capital stock of the bank. On August 2d the assessment was declared delinquent, and the stock ordered to be advertised and sold at public auction; the date fixed, and upon which the sale was made, being September 14, 1901. It will be observed from an inspection of the record that the sale purports to have been ordered on August 2d, or within less than the three months' time required by the statute. Should the time be computed from May 6th to August 2d, the period is still inadequate; and if counted from June 15th, the date of the first meeting of the shareholders, and when the first attempted levy was made, until the date of the sale on September 14th, it would still fall short of the time necessary, for the period must be computed by calendar months: 20 Am. & Eng. Enc. L. 869 (2 ed.) ; *Sheets* v. *Selden,* 2 Wall. 177 (17 L. Ed. 822) ; *Guaranty Trust Co.* v. *Railroad Co.* 139 U. S. 137, 145 (11 Sup. Ct. 512: 35 L. Ed. 116). And this does not include the additional

thirty days' notice, or time required for making the sale after the expiration of the three months.

Under any view, therefore, which may be taken, it is manifest that the time required, essential to "due notice," before the making of the order for the sale of the stock, had not elapsed; and, as this time constituted one of the jurisdictional prerequisites, it follows that the sale was not voidable merely, but absolutely void. I have not understood the contention of petitioners to be that the sale was invalid by reason of irregularities only, but that the jurisdictional steps were not taken prior to the making of the order directing the sale, and that by reason thereof the sale was absolutely void, thereby invalidating all proceedings thereunder.

7. Generally speaking, the proceedings essential to jurisdiction are as mandatory in one class of cases as in another; that is to say, it can make no difference whether it be in a sale of stock to pay an assessment, a sale of land for taxes, or a sale to pay assessments for street improvements. The statutory time prescribed before definite action can be taken to forfeit the property assessed must be complied with. It is so well established that it may be regarded as elementary that the time required to give jurisdiction of a nonresident and sale of attached property under judgment procured thereby, or to give a right to any officer or tribunal to make an order for a sale under either of these circumstances, is a jurisdictional matter, all of which is analogous, so far as the legal effect thereof is concerned, to the question under consideration, with reference to which it has been held in this state, by an unbroken line of decisions extending over a period of more than thirty years, that any sale made in disregard thereof is absolutely void. In this connection a brief review of the authorities may contribute to the foregoing views.

In *Van Sant* v. *Portland,* 6 Or. 385, 399, the court had

under consideration a street assessment, in which the record failed to show that the notice required by the charter before beginning improvement had elapsed before the work was commenced, and that the time specified by the charter had not passed before making the assessment, with reference to which the court observes:

"The city council of Portland in passing the ordinance and levying the assessment under review, was in the exercise of 'a statute authority in derogation of the common law,' which it could only exercise in strict pursuance of the mode prescribed by the statute. Without the notice prescribed by sections 79 and 89 of the charter, the proceeding was without jurisdiction, and was void."

In *N. P. T. Co.* v. *Portland,* 14 Or. 24, 27 (13 Pac. 705, 708) the charter there under consideration, contained the added provision that all proceedings "shall be presumed to be regular until the contrary is shown." In determining this point, Mr. Justice STRAHAN, speaking for the court, remarks:

"In construing a similar section in *Van Sant* v. *City of Portland,* 6 Or. 395, this court said: 'We think that the correct construction of the section is that after jurisdiction of the subject-matter and property is acquired, without which there could be no assessment or levy, the subsequent proceedings will be presumed regular, and duly done or taken, until the contrary is shown.' Here we hold that all the prerequisites of the statute are jurisdictional, and must be complied with, or else the property is not appropriated."

And in *Wright & Jones* v. *Edwards,* 10 Or. 298, in an able opinion, Mr. Justice LORD, now one of the eminent counsel for appellant, says: * * But the case is different where there is an entire want of facts prerequisite to jurisdiction disclosed upon the face of the petition. Then the want of jurisdiction affirmatively appears, and the sale cannot be upheld when collaterally assailed. In such case there is no room to indulge in presumptions. The petition is not silent—it speaks for itself. It shows what

was required to be done to give jurisdiction was not done, and it is useless to look beyond. The authority of the court to act was wanting, and the proceedings are a nullity." Among other final adjudications in this state holding to the same effect are *State* v. *Myers,* 20 Or. 442 (26 Pac. 307) ; *Pilz* v. *Killingsworth,* 20 Or. 432 (26 Pac. 305) ; *O'Hara* v. *Parker,* 27 Or. 156, 174 (39 Pac. 1004) ; *Horn* v. *United States M. Co.* 47 Or. 124 (81 Pac. 1009). And in this connection see 2 Thomp, Corp. § 1762; *Lewey's Island Ry. Co.* v. *Bolton,* 48 Me. 451 (77 Am. Dec. 236) ; *Corwin* v. *Merritt,* 3 Barb. (N. Y.) 341; *Havens* v. *Sherman,* 42 Barb. (N. Y.) 636; *Gibson* v. *Roll,* 30 Ill. 172, 178 (83 Am. Dec. 181) ; *Germantown Pass. Ry. Co.* v. *Fitler,* 60 Pa. 124 (100 Am. Dec. 546; *Hill* v. *Faisin,* 27 Tex. 431; *Lexington Ry. Co.* v. *Staples,* 5 Gray (Mass.) 520.

Authorities directly in point, as, for example, when the jurisdictional point presented relates to the sale of stock for assessments, are not numerous; but the case of *Lewey's Island Ry. Co.* v. *Bolton,* 48 Me. 451 (77 Am. Dec. 236), is analogus to the one under consideration. In that case the plaintiff had subscribed for two shares of the capital stock of the company. Certain assessments had from time to time been levied on the stock, and it was charged:

"That defendant, after due notice, had neglected to pay the same, that the treasurer of the company had, according to law, advertised and sold the same for such unpaid assessments to a third party for a sum less than the sum due, and that the defenadant has become liable to pay the difference between the sum due and the sum for which they were sold."

In considering the legal principles involved, Mr. Justice KENT, speaking for the court, after noting that the action was not upon a contract, but based upon statutory liability arising after the making of legal assessments and

a neglect to pay, and after a sale for nonpayment result-
ing in a deficiency upon the application of the proceeds
of the sale, says:

"It assumes that the defendant is owner of the two
shares, and that he has neglected to pay legal assess-
ments, and that his shares have been sold and transferred
to another by the company according to the statute and
by-laws.    To sustain this action for the deficiency, upon
the ground of this statute liability, the terms of the stat-
ute must be strictly complied with."

.Citing *Portland & Saco Railroad Co.* v. *Graham,* 11
Metc. (Mass.) 1; *Lexington & W. Cambridge R. Co.* v.
*Staples,* 5 Gray (Mass.) 522.

After calling attention to the fact that the charter
of the company required thirty days' notice before an
order of sale of stock could be made, and specifying other
requirements, the court concludes that, inasmuch as the
evidence adduced discloses that the statutory demands
had not been met, a nonsuit should have been ordered.
In the case of *Lexington & W. Cambridge R. Co.* v. *Staples*
there cited, Mr. Chief Justice SHAW makes the following
observation:

"This action for balance due for assessments, after a
sale of the defendant's shares, cannot be maintained.
If the plaintiffs rely upon the statute remedy to recover
the balance after selling the shares, they must comply
with the conditions of the statute, and conform to the
by-laws of the corporation regulating such sale; and the
notices made necessary to the exercise of that power must
be given"—and concludes: "The notice of the time and
place, as given by the advertisement of the auctioneer in
several newspapers, was too short, and was not reason-
able, in a case where the proprietor was well known to
reside in a remote part of another state."

It is also held in *Hill* v. *Faisin,* 27 Tex, 431, that "stat-
utes regulating the general subject of notice are always
to be construed, as respects the computation of time,
most liberally in favor of the party who is to be affected

by the notice which the statute provides." And in *Portland, Saco & P. R. Co.* v. *Graham*, 11 Metc. (Mass.) 1, the court says: " * * To charge the defendant upon this statute liability, the terms of the statute must be strictly complied with. They are conditions precedent" —and holds in that case that no liability was occasioned by reason of the sale there made not being in conformity with the requirements of the statute.

The federal court had under consideration questions bearing upon sales of stock for assessments under the statute under which a sale was made, in the case of *Hulitt* v. *Bell* (C. C.) 85 Fed. 98, in which it was held that, when the bank's capital became sufficiently impaired as to require an assessment on the stockholders, the assessment must be made by the principal officers in the manner specified in section 5205 of the Revised Statutes of the United States; otherwise, the proceedings were void. Also, in *Re Hulitt* (C. C.) 96 Fed. 785, it was held that any shareholder who has paid an assessment levied by the directors in place of having been levied by the shareholders, as prescribed by the statute, is entitled to be repaid the amount thus disbursed; and in the case of *Commercial Nat. Bank* v. *Weinhard*, 192 U. S. 243 (24 Sup. Ct. 253: 48 L. Ed. 425) appealed from this state, the court had under consideration the effect of section 5205, Rev. St. U. S. and holds to the same effect as above. See, also, *Merchants' Nat. Bank* v. *Fouche*, 103 Ga. 851 (31 S. E. 87), considering the same statute on another point.

It would therefore appear to be conclusively settled, from the interpretation of the law in such cases, that, unless the sale is made in the manner prescribed by the act authorizing it, it is necessarily void. I am therefore of the opinion that the order directing the sale of the stock before the expiration of the time prescribed by the statute for notice to the shareholders of the delin-

quency is absolutely void. The majority opinion also refers to the position of the petitioners to the effect that the sale was also invalid by reason of irregularities; but it was also earnestly and strongly maintained in the briefs, and at the oral argument, that the sale, for the reasons above considered, was absolutely void, and under the authorities above cited, as well as a necessary deduction from all rules of construction applicable to such cases, I fully concur in their views upon this point. It remains, then, to be seen whether there has been any acquiescence in, or waiver of, this defect.

After the court acquires jurisdiction, then the matter of notice or want of notice may, under some exceptional circumstances, become an irregularity only; but when the notice prescribed is jurisdictional, it cannot be termed a mere irregularity, and under the facts here presented cannot be deemed waived, nor do the same rules respecting laches apply thereto. As before observed, it is evident from the majority opinion that the conclusion reached is based upon irregularities, and that such irregularities have no reference to the want of the three months' time essential to the jurisdiction necessary to enable the issuance of the order for the sale. It is said in the opinion:

"If such sale is at public auction, after notice, it is not void, but only voidable. It may be ratified by the pledgee, and such ratification will be implied from circumstances, as where the pledgor, with full knowledge of the facts, accepts the proceeds of the sale as a credit on the indebtedness, or when the sale is made with his consent and acquiescence."

I do not question this proposition of law, but hold that it can have no application to the principles here involved. In the first place, as stated, the principal point relied upon by respondents does not relate to the insufficiency of the notice of the sale, but to the inadequacy of the notice of the assessment essential under the statute to the juris-

diction to order the sale of the stock in question. The sale being void, it must follow that no title passed, and there was nothing upon which laches could operate or cure, and nothing in which to acquiesce or ratify, because in law there was no sale, the logical sequence of which is that Ladd & Bush must in law be deemed to be still in possession of the collateral as trustees, and liable to account therefor. They necessarily occupy, as a matter of law, the same position with reference to their liability to account for the stock as they would, had no sale been ordered or made.

The doctrine which denies relief to parties is restricted (except in rare instances, of which this is not one) in its application to cases where third parties have, during the delay, acquired rights, or where the opposite party has so changed his position as to be prejudiced by permitting the negligent party to assert his claims: *Williams* v. *Allison,* 33 Iowa 278. In this case the rights of third parties are not involved, and, for reasons to be given later, in no way can Ladd & Bush be prejudiced by accounting for the collateral. I doubt if an authority can be found holding that where the creditor is the purchaser at a void sale, and is not shown to be prejudiced by the delay, laches may be imputed to the owner of the collateral, where the delay is less than the period prescribed by the statute of limitations. A case is cited, and appears to stand alone, in 16 Cyc. p. 166, to the effect that laches may in some instances be invoked in favor of one claiming under a void sale, but an examination of that case (*Mullan's Adm'r* v. *Carper,* 37 W. Va. 215 (16 S. E. 527), discloses the delay to have been 16 years, or more than the period prescribed by the statute of limitations. In *Wilson* v. *Wilson,* 41 Or. 459 (69 Pac. 923), it was declared to be the rule that mere delay of itself will not constitute laches, but that it must be such delay as has worked an injury to another: *Farr* v.

*Hauenstein,* 69 N. J. Eq. 740 (61 Atl. 147) ; *Hawley* v. *Von Lanken,* 75 Neb. 597 (106 N. W. 456) ; *Ball* v. *Ball,* 20 R. I. 520 (40 Atl. 234.)

9. There is nothing in the record from which it may be inferred that Ladd & Bush have been injured by any delay. They have incurred no additional expense by reason of the purchase, and the respondents offer to pay all moneys advanced in making the purchase, with interest, and that is all they could have demanded, had the stock never been sold; and it would not be seriously contended that, had no stock been sold, laches could be invoked, under the facts here shown, to defeat respondents' claim. The holders of the stock were the creditors, not third parties, and the purchase was made in their own interest, and they have profited thereby to the extent, at least, of making their collateral worth its face value, and under no rule respecting laches can it be held that the few months' delay is sufficient to justify the defense of laches. Nor do I understand the opinion to be based upon the fact that only a few months had elapsed, but on the assumption that a delay of nearly five years had occurred before an attempt was made to repudiate the sale. This assumption is not supported by the record. The record discloses that on September 12, 1902, Ladd & Bush presented to the receiver a verified claim for $12,509.17, the balance then due them, and the time considered in holding respondents guilty of laches is computed from that date. This I believe to be error. The verified claim of Ladd & Bush did not disclose that they had purchased the stock, but merely recites that the stock had been sold, "and that Ladd & Bush had received nothing therefor." This in no way constituted notice to the creditors, nor to the court, that Ladd & Bush had purchased the stock, and their statement to the effect that they had received nothing for it is inaccurate, for the reason that they had received the stock, surrendered it to the

bank, and taken new stock in lieu thereof. The sale of the stock took place in September, 1901, while the verified claim was not filed until September 12, 1902, when the stock was worth at least its par value, $100 per share. The fact of this purchase was not made known either to the receiver or to the creditors, and whether suppressed or concealed is immaterial, for the fact remains that these important matters were not disclosed. As I view it, under the assumption most unfavorable to respondents, laches could not begin to run against either the court, if against the court at all, receiver, or creditors of the Gilbert estate, until after the claim held by Ladd & Bush was satisfied in full, which occurred November 9, 1905. At no time prior to this date could the stock have been redeemed, or any objection made by the receiver or the creditors, without payment in full of the Ladd & Bush claim, for the reason that the stock was held by them, together with certain notes, as collateral security for their claim, and to redeem it the receiver would have been compelled to pay $12,509.17, and the additional sum of $6,300, if the assessment and sale of stock therefor was valid.

10. The statement that from four to five years' time elapsed, by reason of which laches is invoked against the receiver and creditors of the Gilbert estate, is not in harmony with the record. Respondents filed their petition June 20, 1906, or within seven months, instead of five years. Under such circumstances laches cannot be imputed to them. In determining whether laches has run, it should be taken into consideration that there were a large number of creditors, and many obligations growing out of the transaction, which required a reasonable time, to say the least, to enable aggressive action to be taken for the assertion of their rights. The receiver, during the entire period covered by the controversy, could only move by order of the court, and was not an

interested party, but represented all concerned. Again, there is nothing in the record tending to show that Ladd & Bush claimed to own the bank stock in their individual right by reason of their purchase, or that they claimed it at all, except as collateral (that being the purpose for which it was accepted in the first instance), until after respondents instituted this proceeding. It was not unreasonable for them to assume that Ladd & Bush would account to the Gilbert estate for the dividends on the stock received thereon after the claim should be paid in full; hence it cannot consistently be held that there was either waiver, laches, or ratification of the sale of the stock, or any acquiescence; neither the court, the receiver, nor the respondents being in position to ratify or acquiesce. The receiver would not have been authorized to take $6,300 out of the general funds of the Gilbert estate and redeem stock claimed at that time to be worthless, for to do so would be merely adding to the Ladd & Bush collaterial, thereby making them preferred creditors.

I do not understand the record to disclose that the receiver was authorized by the court to compromise the claim here involved, against Ladd & Bush, for $600, or any other sum. This compromise clearly had reference to other matters, and under no possible construction can it be held that this collateral was intended to be included. The petition and offer of Bush was broad enough to have included this stock; but the order of the court, made upon the petition, by its terms excluded the stock, and therefore the court impliedly denied the authority to compromise any right of the creditors pertaining to the stock in question. However, as a full discussion of this, as well as of other statements in the opinion which I do not deem justified by the record, would add extensively to my already too lengthy opinion, I will pass them by; for I think the features hereinbefore discussed ample to

demand an affirmance of the decree of the trial court, and that it should be so ordered.

REVERSED: REHEARING DENIED.

Mr. Justice SLATER, being one of the petitioners, has taken no part in this case, either formerly or on petition for rehearing; and Mr. Justice McBRIDE, having succeeded to the office of Mr. Justice BEAN since the filing of the majority opinion, has declined to participate in the deliberations of this court on the application for rehearing.