## GUARANTY TRUST AND SAFE DEPOSIT COMPANY *v.* GREEN COVE SPRINGS AND MELROSE RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF FLORIDA.

No. 155. Submitted January 21, 1891. — Decided March 2, 1891.

Limitations upon the power of a trustee in a railroad mortgage to take proceedings to enforce payment of the amount secured should be construed strictly.

A provision in a mortgage that the mode of sale provided by it " shall be exclusive of all others " is an attempt to provide against a remedy in the ordinary course of judicial proceedings and oust the jurisdiction of the courts, and is therefore invalid.

A provision in a statute authorizing notice to be given to an absent defendant to appear, by publishing the same in a newspaper once a week for four months, is not satisfied by a publication once a week for four lunar months; but the word " month " when so used signifies a calendar month.

To support a decree for foreclosure against an absent defendant brought in by publication, publication for the full period required is necessary.

*Cooper* v. *Reynolds*, 10 Wall. 308, distinguished.

THIS was an appeal from a decree of the Circuit Court for the Northern District of Florida dismissing a bill of foreclosure filed by the appellant to which the Green Cove Springs and Melrose Railroad Company, the Western Railway Company, the Green Cove Springs and Midland Railroad Company, and a number of other individual defendants were made parties. The mortgage or deed of trust was made June 20, 1882, by the Green Cove Springs and Melrose Railroad Company to the plaintiff to secure its bonds, and the bill averred $25,000 of such bonds to be outstanding and unpaid, and also contained the usual allegations with regard to the non-payment of interest coupons. The bill further averred, in substance, that the company had lost possession of its road and

other property, which was in the possession of and operated by other parties under a pretended sale made August 3, 1885, in pursuance of certain judicial proceedings in the Circuit Court of Clay County, Florida, but claimed that notwithstanding such sale, its lien under the mortgage was not discharged or extinguished. These proceedings were instituted by certain persons composing the firm of Budington, Wilson & Co., who, on July 25, 1884, began a suit in equity in the Circuit Court for Clay County against such railroad company and one Canova, in which the plaintiff, the Trust and Safe Deposit Company, was also mentioned in the stating part of such bill as defendant. It appeared that such suit was begun to enforce a statutory lien for work and labor; that there was no prayer for a foreclosure of plaintiff's deed of trust, nor other relief against the grantee in said deed; nor was any case stated in hostility to the deed or the lien thereunder. It was further alleged that an attempt was made to serve the grantee in the deed by a publication of a notice in accordance with the statute of Florida in the case of a non-resident defendant, but that such statute was not complied with; that no notice was ever served upon the plaintiff, either by publication or otherwise, and the court had no jurisdiction of the person of the plaintiff in such suit, and the sale thereunder was null and void; that at no time before or at the commencement of the publication of the order to appear, nor at any time during the publication of said order, did the state court take possession of said road, or of any of its property by attachment, receiver or other process made or issued in said suit; that on January 16, 1885, a decree *pro confesso* was entered for want of the appearance of plaintiffs therein; that on March 11, 1885, the firm of Budington & Wilson, a distinct and separate firm from Budington, Wilson & Company, and one Osias A. Budington, intervened in said suit by petition, and alleged a new and distinct cause of action against the defendant railroad company, not stated in the original bill of complaint, namely, a statutory lien for labor performed for the sum of $1700, and said Budington also averred that he had recovered a judgment against said company for the sum of $1012.50, and they prayed for leave

to prove their claims in said suit. But neither of the said intervenors prayed any relief against the grantee in the deed of trust, nor did either of them, nor did any person in their behalf, serve or attempt to serve any notice on said grantee of the filing of said petition, nor the claims therein asserted. It was further alleged that on the 12th of November, 1884, the several parties who had appeared in the said suit entered into an agreement for a sale of the road, which took place on August 3, 1885; the defendant Greely becoming the purchaser as trustee for himself and all others who had filed claims or demands against said company, for the sum of $20,000: and that subsequently, and under an agreement of the various creditors of the road who had transferred their claims to Greely, consenting that he should organize a new company, he executed a lease of the road to a corporation known as the Western Railway Company, by which it was agreed that such company should pay by way of rent eight per cent per annum upon a valuation of $30,000, for five years. The bill further charged that " the feeble defence and supineness and indifference to the interests of the said bondholders on the part of the said Green Cove Springs and Melrose Railroad Company, its directors and officers, as shown by the said judicial proceedings in said state court, if the same was intended to affect and destroy the lien of said deed of trust, was and is a fraud upon the rights of the said trustee and said bondholders;" that the sale and subsequent proceedings were fraudulent, and should be vacated and set aside; "that said company, grantor in said deed of trust, in effect consented to a sale of said road to pay simple contract debts and demands, which were not a lien upon its property paramount to said lien created by said deed of trust, and many of which had not been reduced to judgment:" that every lien for work and labor performed was declared by the decree of the court in favor of persons who were not parties to the original bill of Budington, Wilson & Co., but who had come into said cause long subsequent to the decree *pro confesso,* and asserted their claims thereafter, of which said grantee and bondholders had no knowledge whatever: that the aggregate amount of the said statutory liens so

found to exist was less than $700; that no time for redemption was allowed, but on the contrary "a decree of sale was made before the indebtedness claimed to be due was ascertained, whereby no party in interest was given any time or opportunity to redeem or pay said indebtedness." The bill prayed for a receiver and injunction against the transfer or encumbering of the road; a decree of foreclosure of the deed of trust; and for a decree declaring the sale under the judicial proceedings in the state court to be null and void, as against the plaintiff and the *bona fide* holders of any of its bonds.

Two answers were filed to the bill, which presented three distinct defences. First, that the mortgage or deed of trust required that 60 per cent in value of the outstanding bondholders should request the trustee in writing to initiate proceedings, and that no such request was alleged in the bill. Second, that plaintiff herein, the Guaranty Trust and Safe Deposit Company, was a party defendant to the proceedings in the state court, was bound by the decree and sale in that court, and that such sale extinguished the lien of the mortgage sought to be enforced in this suit. Third, that there were no bonds of the railroad company which executed the mortgage to the plaintiff legally outstanding, and consequently it had not sufficient interest or title to maintain its suit. A decree was entered in the Circuit Court dismissing the bill, but no opinion appears to have been delivered or filed.

*Mr. H. Bisbee* for appellant.

*Mr. J. C. Cooper* for appellees.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. The answer of Philip J. Canova raises an objection to the maintenance of this bill in the fact that sixty per cent in value of the bondholders had not requested action upon the part of the trustee, as required by the trust deed, which, in covenant numbered second, provides in substance that, in case of default

after demand made, for a period exceeding twelve months, to pay the semi-annual interest upon the bonds, or for a period exceeding six months to pay the principal of such bonds, "it shall be the duty of the said trustees for the time being, and they shall or will, upon written request of the holders of sixty per centum of the said bonds then outstanding, enter upon and take possession of the said railroad property and estate," and operate the same, appropriating the net income to the best advantage, etc., "or the said trustee shall and will, after or without entering upon or taking such possession, upon the written request of the holders of bonds of a like amount, proceed upon and under this indenture of mortgage to sell the railroad property and estate, . . . at public sale, in the city of Philadelphia, first giving at least four weeks' notice by publication, etc.," and grant and convey the same to the purchaser, freed from all and every trust hereby created, etc."

As there is no averment in the bill that sixty per cent of the owners of the outstanding bonds had requested action on the part of the trustee, it is insisted that these proceedings were instituted without authority, and the case of *Chicago &c. Railroad Co.* v. *Fosdick*, 106 U. S. 47, 77, is claimed to be decisive of this question. In that case, which was a bill for foreclosure, the proviso was that the trustee, upon the written request of the holders of a majority of the bonds then outstanding, should proceed to collect both principal and interest of all such bonds outstanding, by foreclosure and sale of said property, or otherwise, as therein provided. It was argued that the office of this clause was merely to make the obligation of the trustees imperative instead of optional, but the court held that the whole article must be taken together as a unit, and "the nature of the provision and the character of its object must be taken into consideration as furnishing the rule of its interpretation." It will be observed, however, that the proviso was directed against the very proceeding taken by the trustee in the suit, namely, a foreclosure and sale of the property ; while in the present case it is directed only to a taking possession, or a sale *under the deed of trust* without the institution of legal proceedings.

A case nearer in point is that of *Morgan's Steamship Co.* v. *Texas Central Railway*, 137 U. S. 171, decided at the present term, in which the condition was that on default continuing for sixty days in the payment of interest or any part of principal, the principal of the bonds should become immediately due, and that upon request of seventy-five per cent of the holders of bonds, and written notice of the same, the trustee should take possession of the property, and operate it for the benefit of the bondholders, and that upon like request he should proceed to foreclose the mortgage and sell the property to the highest bidder for cash. It was also provided that nothing contained in the instrument should be construed to prevent or interfere with the foreclosure by any court of competent jurisdiction. It was held that the trustee could maintain a bill to foreclose the mortgage upon occurrence of a default, without averring or proving a request of seventy-five per cent of the bondholders, as such request was necessary only in case the trustee wished to proceed to foreclose or take possession *ex mero motu* without the intervention of a court.

We think that such limitations upon the power of the trustee to take legal proceedings to enforce payment of the amount secured, should be strictly construed. In this case, the condition only relates to the taking possession of the property under the deed of trust, or to a sale in the city of Philadelphia, under the power of sale contained therein, and we think it should not be held to apply to foreclosure proceedings begun in a court of competent jurisdiction to obtain a judicial sale of the property. This was the ruling in the Eighth Circuit, by Judge Dillon in *Alexander* v. *Central Railroad of Iowa*, 3 Dillon, 487; and by Judge Caldwell in *Credit Co.* v. *Arkansas Central Railroad Company*, 15 Fed. Rep. 46; and we think it is sound.

It is true there is a subsequent provision in the deed of trust to the effect that neither the whole nor any part of the premises mortgaged shall be sold, under proceedings either at law or equity, for the recovery of the principal or interest of the bonds, it being the intention and agreement of the parties that the mode of sale provided by the mortgage "shall be exclusive

of all others." This clause, however, is open to the objection of attempting to provide against a remedy in the ordinary course of judicial proceedings, and oust the jurisdiction of the courts, which, as is settled by the uniform current of authority, cannot be done. *Hope* v. *International Society,* 4 Ch. D. 327; *Edwards* v. *Aberayron Ins. Society,* 1 Q. B. D. 563; *Horton* v. *Sayer,* 4 H. & N. 643; *Scott* v. *Avery,* 8 Exch. 487; *S. C.* 5 H. L. Cas. 811; *Thompson* v. *Charnock,* 8 T. R. 139; *Mitchell* v. *Harris,* 2 Ves. Jun. 129; *Tobey* v. *County of Bristol,* 3 Story, 800; *Noyes* v. *Marsh,* 123 Mass. 286; *King* v. *Howard,* 27 Missouri, 21; *Conner* v. *Drake,* 1 Ohio St. 166; *Trott* v. *City Ins. Co.,* 1 Cliff. 439; 2 Story Eq. § 1457.

Again; it is evident that this was a condition for the benefit of the grantor and its assigns, and that intervening lien holders, and those who have purchased the property under decrees in their favor, do not stand in a position to take advantage of this covenant. The sole object of the covenant was to protect the mortgagor against a seizure and sale of its property for non-payment of interest or principal at the mere caprice of the trustee, or without the consent of a majority of the bondholders, and it has no application to a case where the mortgagors have already lost the property under adverse proceedings instituted by parties having no connection with the mortgage.

2. The validity of the sale in the state court is attacked upon the ground that proper notice of the proceedings was not given to the plaintiff in this case, as required by the Florida statute, which provides, in substance, that non-resident defendants may be required to appear, if residing within the United States, within four months, by a publication to be made *once a week* for the *four months.* The facts with regard to the publication in this case are as follows: On February 23, 1884, Philip J. Canova filed a bill in the state court against the Green Cove Springs and Melrose Railroad Company. The gravamen of the bill was that the company owed Canova over $19,000 as contractor, and that he had a lien as such contractor superior to the lien of the bonds secured by the mortgage to the plaintiff in this case. Plaintiff was not named a

defendant in that bill.   On the day the bill was filed the state court appointed a receiver of the property.

In the latter part of July, 1884, Budington, Wilson & Company filed a bill in the same court against the Green Cove Springs and Melrose Railroad Company, Philip J. Canova, the Chester Construction Company and the Guaranty Trust and Safe Deposit Company, plaintiff in this suit, to recover for labor in building the road, and to enforce the payment of certain of these bonds deposited with it as collateral security. On the 6th of February, 1885, these two suits in the state court were, by order of that court, consolidated, and thereafter proceeded as one suit.   Before this consolidation was effected, however, and on July 29, 1884, the court made an order that the Trust and Safe Deposit Company appear and answer the bill of complaint on or before the first Monday of December, 1884, "otherwise the complainants' said bill shall be taken *pro confesso*."   It was further ordered that this order " be published once a week for four months in some paper published in Clay County, Florida."   The only evidence of publication appears from the affidavit of H. E. Bemis, the business manager of the " Springs," a newspaper published in the town of Green Cove Springs, that the foregoing notice " was duly published in the said newspaper for nineteen consecutive weeks prior to this date, to the best of his knowledge and belief." This affidavit was made and subscribed the 15th day of December, 1884.   The testimony further established that the newspaper was published on Saturday of each week, and as the manager swears that it was published for nineteen consecutive weeks prior to this date, the last publication must have been upon Saturday, December 13, and the first publication on the 9th of August.   The notice, however, required the absent defendants to appear and answer the bill on or before the first Monday in December, which was the first day of the month; hence, there could have been only seventeen publications, including the first on the 9th of August, before the day the defendants were required to answer, and from this day to the first Monday of December would be only 114 days, more than four *lunar* months, but eight days less than four *calendar* months, before the first of December.

The regularity of the proceedings then resolves itself into the question whether the provision that publication shall be made once a week for four months is satisfied by a publication for sixteen weeks or four lunar months. We think it is not. It is the settled law both of this court, and of the Supreme Court of Florida, that the word "month," when used in contracts or statutes, must be construed, where the parties have not themselves given to it a definition, and there is no legislative provision on the subject, to mean calendar and not lunar months. In *Sheets* v. *Selden's Lessee*, 2 Wall. 177, it was applied to proceedings for the forfeiture of a lease. It was contended in that case that in the absence of any legislative provision on the subject, the term must be construed to mean lunar and not calendar months, in accordance with the English rule, but it was held that the term was not technical, that it must be construed in its ordinary and general sense, and that in this sense calendar months are always understood. In *Bacon* v. *State*, 22 Florida, 46, it was applied to the limitation by law of the time for presenting a bill of exceptions to the judge for allowance, the court holding that where the term month is used in an order of this kind, and no other meaning is given to it by the terms of such order, it should be construed as meaning a calendar month. "Such has been the practical construction of the word in this State in matters of practice." In both cases the old English rule was alluded to and disapproved. Indeed, that rule, which was apparently general, except as applied to bills of exchange and other commercial contracts, never seems to have obtained any substantial foothold in this country, though followed reluctantly in some of the older decisions, and has been practically abolished in all the States, either by express statute or by judicial interpretation. The word was held to import a calendar month as early as 1794, in the Circuit Court for the District of Pennsylvania, in construing an act of the legislature, (*Brudenell* v. *Vaux*, 2 Dall. 302,) and in 1808, in the Supreme Judicial Court of Massachusetts, it was said that "in this State, as well before as since the Revolution, a month mentioned generally in any act had immemorially been considered as a calendar

month." *Avery* v. *Pixley*, 4 Mass. 460, 461. Indeed, the English rule was not adopted without a protest from Lord Kenyon, one of the most eminent of her common law judges, in *Lacon* v. *Hooper*, 6 T. R. 226, and was abolished by statute in 1850. 13 & 14 Vict. c. 21.

It is claimed, however, that as the proceeding to foreclose this deed was *in rem*, the seizure of the property proceeded against was the foundation of the jurisdiction of the court, and that a defective publication of notice, though it might reverse a judgment in such a case for error in departing from the directions of the statute, does not render such a judgment, or the subsequent proceedings, void; and the case of *Cooper* v. *Reynolds*, 10 Wall. 308, is relied upon in support of this position. While the ruling of this court in that case appears to have been that jurisdiction is acquired by an actual seizure of the property attached, and that defective or irregular affidavits and publications of notice do not render such a judgment void, the case really turned upon the fact that the suit was begun by a seizure of the property of the defendant under a writ of attachment, and in that respect it is distinguishable from this case; for although the court was in possession of the property proceeded against in the bill filed by Budington, Wilson & Co., to which the Trust and Safe Deposit Company was defendant, such receiver had been appointed upon the bill filed by Canova, to which the plaintiff was not made a party; and the order consolidating that cause with the suit by Budington, Wilson & Co., in which the plaintiff was named as party, and in which it was attempted to obtain service by publication, was not made until February 6, 1885, two months after the expiration of the time within which the notice of publication required the plaintiff to answer, and after a decree *pro confesso* had been taken against it. The receivership could not have the effect of subjecting the property to the control of the court in the particular bill filed by Budington, Wilson & Co. against the plaintiff, until the order of consolidation which, as before stated, was after the time limited for plaintiff's appearance, and after an order *pro confesso* had been entered against it. The case of *Cooper* v. *Reynolds* was one

where property was seized by virtue of an attachment taken out at the commencement of the suit in which the proceedings to call in the non-resident defendant were had, and the record asserted that " publication had been made according to law." Indeed, Mr. Justice Miller said in that case, p. 319, " we do not deny that there are cases . . . in which the legislature has properly made the jurisdiction to depend on this publication of notice, or on bringing the suit to the notice of the party in some other mode, when he is not within the territorial jurisdiction." It was said by Mr. Justice Wayne, in *Williamson* v. *Berry*, 8 How. 495, 540, in reply to an argument that a decree in chancery could not be looked into in a collateral way, that " it is an equally well-settled rule in jurisprudence, that the jurisdiction of any court exercising authority over a subject may be inquired into in every other court, when the proceedings in the former are relied upon, and brought before the latter, by a party claiming the benefit of such proceedings. The rule prevails whether the decree or judgment has been given in a court of admiralty, chancery, ecclesiastical court or court of common law." The decisions of this court upon this subject, beginning in the year 1794 with the case of *The Betsey*, 3 Dall. 6, have been uniform and consistent. The following are a few of the leading cases upon this subject : *Rose* v. *Himely*, 4 Cranch, 241; *Elliott* v. *Peirsol*, 1 Pet. 328 ; *Wilcox* v. *Jackson*, 13 Pet. 498; *Shriver's Lessee* v. *Lynn*, 2 How. 43 ; *Lessee of Hickey* v. *Stewart*, 3 How. 750; *Webster* v. *Reid*, 11 How. 437. In the last case it was held that where jurisdiction had been sought to be obtained by publication, as in this case, it was necessary to show that notice had been given by publication as the act required. "If jurisdiction," says the court, " could be exercised under the act, it was essential to show that all its requisites had been substantially observed. It was necessary for the plaintiff to prove notice, and negative proof that the notice was not given, under such circumstances, could not be rejected." In *Hunt* v. *Wickliffe*, 2 Pet. 201, an order was made by a state court of chancery for a non-resident to appear, and that a copy be published " for eight weeks in succession agreeably to law," and it was

held that, as the laws of Kentucky only authorized their courts of chancery to make decrees against absent defendants on the publication of an order for two months successively, the order of the court of chancery for a publication for eight weeks was not a compliance with the law, the Supreme Court of Kentucky having decided that the publication must be continued for two calendar months. Under this construction of the act, the decree was made against persons who were not parties to the suit, and it was held that it could not affect them. So in *Galpin* v. *Page*, 18 Wall. 350, it was held that when by legislation of a State constructive service of process by publication is substituted in place of personal service, the statutory provision must be strictly pursued in order to bind a citizen of another State not personally served. " Whenever," says Mr. Justice Field, " it appears from the inspection of the record of a court of general jurisdiction that the defendant, against whom a personal judgment or decree is rendered, was at the time of the alleged service without the territorial limits of the court, and thus beyond the reach of its process, and that he never appeared in the action, the presumption of jurisdiction over his person ceases, and the burden of establishing the jurisdiction is cast upon the party who invokes the benefit or protection of the judgment or decree. . . . When, therefore, by legislation of a State, constructive service of process by publication is substituted in place of personal citation, . . . every principle of justice exacts a strict and literal compliance with the statutory provisions." pp. 368, 369. Later cases to the same effect are *Earle* v. *McVeigh*, 91 U. S. 503; *Settlemier* v. *Sullivan*, 97 U. S. 444; *Cheely* v. *Clayton*, 110 U. S. 701; *Applegate* v. *Lexington &c. Mining Co.*, 117 U. S. 255; and there is scarcely a State in the Union in which the same principle has not been announced and reaffirmed.

We think the publication of the notice in this case for the full period required by law was necessary to the validity of the decree pronounced upon the basis of such publication, *Early* v. *Doe*, 16 How. 610, and as such publication was not made for that period, the decree based upon such notice was no estoppel of the plaintiff in this case.

3. It is claimed, however, that the decree dismissing the bill was proper, because there were no bonds of the railroad company, whose property defendant purchased at the sale by the state court, and which executed the mortgage to the plaintiffs, legally outstanding, and consequently plaintiff had not a sufficient interest or title to maintain this suit. On December 23, 1886, about a month after the bill, and a few days after the answer was filed, an order was entered referring the cause to a master, to notify all persons holding bonds or coupons of the railroad company to file the same with the master before the 1st day of February, 1887, with power to any party to the suit, or any person who should have filed any such bonds or coupons, to take testimony before the master, touching the holding and ownership of the same, with a reservation on the part of the court to pass upon all questions of law or fact connected therewith. In pursuance of this notice bonds to the amount of $23,000 were filed by Ambler & Taliaferro, the validity of which was made the subject of contention. These bonds were purchased by them in Jacksonville through John T. Walker, agent of the purchasers, Taliaferro giving his check for the money. The bonds belonged originally to Thomas S. Harris, of Philadelphia, who sent them to J. C. Marcy, an attorney residing at Jacksonville, with an affidavit that he was a *bona fide* holder and owner of the bonds; that he acquired the same for value, and without notice that the bonds were issued improperly and without consideration. Marcy swears in this connection that he sold $23,000 face value of the bonds to Walker, as agent of the purchasers, and was paid the sum of $3450 therefor. He had notified Harris of the order of the special master that the bonds were to be filed on or before a certain day, and that these bonds must be accompanied by an affidavit of *bona fide* ownership. The sale, which had been talked about some time before, took place at the National Bank of the State of Florida. He delivered the affidavit, with the bonds, to the purchasers. He also swears emphatically that he had not, at the time he sold the bonds, knowledge of any fact which led him to suspect or believe that Harris had no right to sell

them, nor had Walker such knowledge, so far as he knew. He says: "I cannot by any probability imagine that he could have any suspicion of the invalidity of any of the bonds sold to him." Walker, who is also a lawyer at Jacksonville, swears that he was employed by Ambler & Taliaferro to look into the condition of the affairs of the company, with the expectation of their becoming the purchasers, if they could do so safely. "My investigation satisfied me that there was a number of bonds outstanding of this company which were of doubtful validity as liens. . . . With Mr. Marcy's assistance I ascertained all the facts touching the *bona fide* holding of the bonds in Philadelphia. The evidence satisfied us that all the bonds were purchased in good faith, and I authorized Mr. Marcy to represent my clients and complete the transactions with these parties, Dunn and Harris, carefully instructing him to avoid the purchase of any bonds of Mr. Shreve Ackley, as to the validity of whose holding I had come to entertain doubts." He further testified that he required an affidavit of *bona fide* holding to accompany the bonds, and that no fact came to his knowledge which would raise any suspicion in his mind that the holder had no right to sell them. Mr. Taliaferro also swears that he had not the slightest knowledge of any facts which would lead a man of prudence to suspect that the bonds were not valid, nor even a suspicion. He had gone through the country, over the road, and had made up his mind that it would be a desirable purchase in connection with his timber interests. Acting under the advice of Mr. Walker, he authorized him to go to Philadelphia to endeavor to purchase the bonds. The only fact relied upon to show want of good faith appears to be that these bonds were sold upon the day of the sale of the railroad property, under the decree of the state court, and after the parties attending the sale, including Walker, the agent of the purchasers, had returned from Green Cove Springs, where the sale was made, to Jacksonville. Without going further into the evidence we think there is sufficient to show that there are bonds outstanding secured by this mortgage upon which plaintiff is entitled to maintain this bill, and that it is not necessary at this stage

of the case to determine as a finality the amount, validity or ownership of such bonds, or the number which were held *bona fide* by the present holders; but that the case should be reversed and remanded for further proceedings in conformity with this opinion. Should the court proceed to a decree for foreclosure and sale, the holders of the bonds can be notified to appear and file them with the master, and all questions connected with their amount and ownership can be settled upon a final hearing.

The decree of the court below will, therefore, be

*Reversed.*