BUILDING TRADES COUNCIL OF RENO AND VICINITY; HOD CARRIERS, BUILDING AND COMMON LABORERS LOCAL UNION No. 169; UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA LOCAL UNION No. 971; PLUMBERS & STEAMFITTERS LOCAL UNION No. 350; PAINTERS, DECORATORS AND PAPERHANGERS LOCAL UNION No. 567; SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION No. 26; UNITED SLATE, TILE AND COMPOSITION ROOFERS, DAMP AND WATERPROOF WORKERS LOCAL UNION No. 224; OPERATIVE PLASTERERS AND CEMENT FINISHERS LOCAL UNION No. 241; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION No. 401; BRICKLAYERS AND MASONS LOCAL UNION No. 1 OF NEVADA; ERNEST M. REYNOLDS; LOUIS PALEY; ROBERT GAUSSI; D. W. EVERETT; SIDNEY DALTON, APPELLANTS, v. BRUCE R. THOMPSON, RESPONDENT.

No. 3654

July 26, 1951.

234 P.2d 581.

*Virgil H. Wedge,* of Reno, and *P. H. McCarthy, Jr.,* of San Francisco, California, for Appellants.

*Springmeyer & Thompson,* of Reno, for Respondent.

## OPINION

By the Court, BADT, C.J.:

Concerted action by defendants by way of strike, picketing and boycott resulted in damages to plaintiff which the jury assessed at $250 on the first count and at $6,500 on the second count. If the objective of the concerted action was lawful on either count, the verdict on such count cannot stand. If the objective was unlawful as to either or both counts, the trial judge properly let the case go to the jury on such count or counts. With the exception of certain incidental points of law raised by appellants, and which will later be disposed of, both parties agree that the lawfulness of the objectives sought by the defendants is the question presented for our consideration. More specifically the two causes of action pleaded by plaintiff present the following questions:

(1) Is the compelling of an employer by a union to see that an individual employee pays a $50 fine assessed against him by the union, under the circumstances herein appearing, a lawful objective of a strike, picketing and boycott?

(2) Is the compelling of an employer by a union to make a $1,000 contribution to a named charity as a penalty for the employer's employment of an employee not in good standing with his union, a lawful objective of a strike, picketing and boycott?

The district court, in its rulings on demurrer, on motion for nonsuit, on motion for a directed verdict, in its instructions to the jury, and in its order denying a new trial, answered both questions in the negative. The result was a verdict by the jury in favor of plaintiff and against the defendants for damages resulting from strike, picketing and boycott involving the first proposition in the sum of $250, and involving the second proposition in the sum of $6,500. We have concluded that the

judgment should be affirmed on both causes of action.

The facts, reduced to their essentials, were as follows: Applying abbreviated names, Hod Carriers Union No. 169, Carpenters Union No. 971, Plumbers Union No. 350, Painters Union No. 567, Sheet Metal Workers Union No. 26, Roofers Union No. 224, Plasterers Union No. 241, Electrical Workers Union No. 401, and Bricklayers Union No. 1 are the usual unincorporated union associations. Building Trades Council of Reno and vicinity is an organization including as its members or affiliates sundry labor unions including those last-named and operating under the Building and Construction Trades Department of American Federation of Labor whose constitution contains various provisions with reference to affiliation of Local A. F. of L. Building Trades unions with the local Building Trades Council. Appellant Reynolds is the secretary-treasurer and business agent of appellant Building Trades Council. Appellant Paley is secretary and business agent of appellant Carpenters Union. Appellant Gaussi is secretary and business agent of appellant Hod Carriers Union. Appellant Everett is secretary and business agent of appellant Painters Union, and appellant Dalton is secretary and business agent of appellant Plumbers Union.

With certain exceptions and subject to certain conditions not here applicable, the Council has full jurisdiction over strikes. A contractor who works on a struck job or employs nonunion men to work on a struck job, is declared unfair, and in such case all union men are called off the work. The business agent of the Council has power to order strikes when so instructed by the Council or executive board. Employees on a struck job must leave when so ordered by the business agent, and must remain away until a settlement is officially made. The foregoing provisions and others more elaborately expressed appear from the exhibits received in evidence.

On July 1, 1948 plaintiff commenced construction of a residence property in Washoe County, and employed

one Robert M. Ross to manage the construction, purchase materials and negotiate subcontracts subject to plaintiff's approval. Ross's authority included the "hiring and firing" of workers. He was not only superintendent of the job but was to do a journeyman's work operating with the tools of his trade. At the time of his employment his union status was that of a suspended member of the Carpenters Union by reason of an unpaid fine theretofore imposed on him by the Carpenters Union because he, a carpenter, had worked as a plasterer. Such suspension had been imposed some two months prior to his employment by respondent. Respondent was notified by the Carpenters Union that the carpenters would be taken off the job by reason of Ross's status. A conference was had between respondent and representatives of the Building Trades Council, the Carpenters Union, the Hod Carriers Union, the Painters Union and the Plumbers Union. Various points of disagreement were disposed of, leaving only the question of the payment of Ross's fine to the Carpenters Union. This point of disagreement is designated by respondent as the requirement that he make Ross pay the fine. It is defined by appellants as simply their insistence that respondent employ only union men, that if Ross were to be employed as a carpenter using tools, in addition to his employment as superintendent, he would have to reinstate himself with his union by paying the $50 fine or that respondent would have to do it for him.

Respondent refused to pay Ross's fine, or to make Ross pay it. A picket line was established for a period of time, delivery of concrete was delayed, and the plumbers refused to cross the picket line. For a number of weeks respondent's name was included in the "We Do Not Patronize list" circulated by the Building Trades Council of Reno and vicinity and the Carpenters Union.

Respondent for a time went on with the construction of his residence until November 15, 1948. Building

Trades Council then reestablished the picket line at the construction and respondent's employees left the job. Respondent and Ross determined that the job could not be completed under the circumstances. Further conferences were had with representatives of the Council and the Carpenters Union. Respondent agreed to discontinue construction until he could employ union men and the representatives withdrew the picket line and said they would investigate as to what would be required to reinstate Ross in the Carpenters Union. At a meeting of November 15, 1948 respondent was requested to execute the standard form of contract submitted by the Building Trades Council providing that he should employ only union men for a period of one year. He refused upon the ground that he was not a contractor normally engaged in hiring people and that there was no reason for him to sign such general agreement, but advised that he was willing to give his personal assurance that he would close down the job until he could hire union men. On November 23, 1948 respondent received the following letter on the stationery of Building Trades Council of Reno and Vicinity dated November 20, 1948, and signed by Mr. Reynolds, its secretary-treasurer:

"This letter is to inform you that the Building Trades held their regular meeting Friday evening at 8 p. m., November 19, 1948.

"Your case came up for discussion and was finally disposed of by requesting that you donate $1000 to the Children's Home in Carson City, Nevada.

"After this has been done, we will put you on our 'Patronize List.' As to your standing just now, you are still on our 'We Do Not Patronize List'."

After respondent received this letter, he employed Ross and another man, and they did what they could to protect the unfinished house with plywood sheets, etc. Respondent's complaint was filed in the court below

November 30, 1948.[1]  On December 17, 1948 the following resolution, as certified by the secretary-treasurer, was adopted by Building Trades Council of Reno:

"RESOLUTION

"Whereas, the letter dated November 20, 1948, addressed to Bruce R. Thompson, 1078 Evans Avenue, Reno, Nevada, does not properly express the position of this Council, and,

"Whereas, it is the desire of this Council that any misunderstanding which may have resulted from the sending and receipt of the said letter be cleared up,

"Now, Therefore, Be It Resolved that any and all acts of this Council; its officers, members, and agents, leading up to and including the sending of said letter, and the said letter itself be, and they are hereby, withdrawn, retracted, and set aside, and

"Be It Further Resolved that the name of Bruce R. Thompson be stricken from the 'We Do Not Patronize' list of this Council, and

"Be It Further Resolved that the Secretary-Treasurer of this Council be, and he is hereby, instructed to send a copy of this resolution, signed by him as Secretary-Treasurer, and attested to by the seal of this Council, to the said Bruce R. Thompson to the end that he may be fully advised of the action of this Council."

It is unnecessary to detail the items of loss claimed by the plaintiff.  They include losses on the plumbing job, losses growing out of the delay in completion of the work, certain work that had to be replaced, payments to superintendent Ross for time trying to find workmen, damage to the property during winter months when no

---

[1]Thus, as in Jensen v. Reno Central Trades & Labor Council, 68 Nev. 269, 229 P.2d 908, decided by this court April 15, 1951, we are not concerned with the act of March 14, 1951 (Stats. 1951, 111) amending sec. 10473, N.C.L.1929.  This section, as originally enacted and as amended in 1951, is set forth in full in footnote 1 of the opinion in the Jensen case.

work could be done, damage to material stored in the unfinished house, etc. These were all elements for consideration by the jury.

We address ourselves first to the second cause of action. Respondent was placed on the "We Do Not Patronize" list, in other words, boycotted, until such time as he might relieve himself from that situation by donating $1,000 to the Children's Home in Carson City. Our conclusion is that the learned district judge was correct in holding that this count of the complaint stated a cause of action and in his consistent rulings thereafter denying the motion for nonsuit, the motion for a directed verdict and the motion for new trial.

The issue is clear-cut. Plaintiff concedes the right of members of the defendant unions to refuse to work with nonunion men and the right of the defendants to picket the premises and to place the plaintiff on the "We Do Not Patronize" list where the objective of such concerted action is lawful. Culinary Workers Union v. District Court, 66 Nev. 166, 207 P.2d 990, 66 Nev. 202, 210 P.2d 454. The defendants concede that an unlawful objective renders the concerted action unlawful. Hotel and Restaurant Employees International Alliance v. Wisconsin Employment Relations Board, 315 U.S. 437, 62 S.Ct. 706, 86 L.Ed. 946; Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154. They insist however that there is nothing unlawful in requiring the plaintiff to pay $1,000 to a worthy charity. In answer to an inquiry from the court during oral argument, their counsel stated that there would be like justification in requiring plaintiff to pay $2,000 or a greater sum. He compares the situation to one in which a regular client of his office might see fit to withdraw his employment of counsel, and persuade his friends likewise to withdraw their employment of counsel, unless such counsel would consent to make certain contributions to some certain specified charity. Without considering what, if any, legal

results might flow from such hypothetical case, it is clear, without detailed analysis, that the suggested hypothetical situation is by no means analogous to the instant case. We likewise reject the asserted analogy that veterans' associations distributing "buddy poppies," and Community Chest workers distributing "red feathers," thus advertise to the public that nonwearers of these emblems have not contributed. We do not need the insistence of defendants, to make us agree that there is nothing unlawful, that it is indeed a praiseworthy thing, to give to charity. That gift may be only "the poor man's crust." It may be only "the blessing of the poor, though I turn me empty from his door." Each man must reconcile with his own conscience the recipients, nature and extent of his charities. That the $1,000 penalty assessed against plaintiff by Building Trades Council was not to go into the treasury of the Building Trades Council or of one of the unions but was to be paid to the Children's Home in Carson City clearly does not change the effect of the penalty. Failure to comply was the continued inclusion of plaintiff's name on the "We Do Not Patronize" list. This, like the picketing, was "notice to the world that organized labor [had] blacklisted [the] employer." Chadwick, J., in St. Germain v. Bakery and Confectionary W. Union, 97 Wash. 282, 166 P. 665, 671, L.R.A. 1917 F. 824.

The objective of this action, namely, compelling respondent to pay the $1,000 penalty, was clearly unlawful. Burke v. Fay, 128 Mo.App. 690, 107 S.W. 408. The rule has been stated in various ways. In 31 Am.Jur. 942, Labor, sec. 221, it is said that a strike to compel payment of a so-called fine imposed upon an employer by a union is unlawful. It is said in the Restatement of the Law of Torts, sec. 792: "The payment by an employer of a fine or penalty which he has not agreed to pay is not a proper object of concerted action against him by workers." The annotation to

Dorchy v. Kansas, 272 U.S. 306, 47 S.Ct. 86, 71 L.Ed. 248, commencing at the last citation, is devoted to "Purposes for which strike may lawfully be called." Citing Burke v. Fay, supra, and other authorities, it rejects, as a lawful purpose, the compelling of an employer to pay a fine or penalty imposed by the union. See also annotation at 116 A.L.R. 486, and prior annotations therein referred to. No cases have been cited by appellants, and an independent search has failed to disclose any, contrary to the rule above stated.

Plaintiff's first cause of action presents a conflict in the evidence. If the contention of the appellants is correct and their concerted action against the plaintiff was simply for the purpose and objective of compelling the reinstatement of Ross as a member in good standing of the Carpenters Union by his payment of the $50 fine previously assessed against him, we should be inclined to find a close analogy between such situation and the one approved by a majority of this court in Culinary Workers Union v. District Court, 66 Nev. 166, 207 P.2d 990, 66 Nev. 202, 210 P.2d 454, followed in Jensen v. Reno Central Trades & Labor Council, 68 Nev. 269, 229 P.2d 908. There is little, if any, difference in principle between the compulsory payment of union initiation fees and dues there approved as an objective for concerted action and the reinstatement of the employee by the payment of a fine for violation of the rules of the union. If this were the situation, it would support the conclusion that the objective of the concerted action was a proper one under the rule concisely stated in the Restatement of the Law of Torts, chap. 38, sec. 790, as follows: "Dismissal by an employer of an employee is a proper object of concerted action by his employees if the employee * * * has been legally suspended or expelled from such union."

The jury, however, was not compelled to accept appellants' theory of the evidence. The conference of July

16, 1948 (held after the withdrawal of the men from the job on July 13) was attended by Mr. Reynolds, business agent of the Building Trades Council, Mr. Paley, business agent of the Carpenters Union, Mr. Gaussi, business agent of the Hod Carriers Union, Mr. Everett, business agent of the Painters Union, and Mr. Dalton, business agent of the Plumbers Union. Respondent describes what occurred as follows:

"Well, I was seated in a chair by Mr. Reynolds' desk, and he was seated, and Mr. Dalton and Mr. Everett were seated across the room and Mr. Paley was standing. I opened the conversation by telling them that I had come to find out why they had taken the Union carpenters off the job because I wanted to hire Union men and pay them Union wages. Mr. Reynolds replied that Mr. Ross owed a fine of $50 to the Carpenters Union which he had not paid and that I should get rid of Ross and hire some other man.

"Mr. Paley then said that he had several men he could recommend to me to do the work.

"I told them that I did not want to discharge Ross, that I didn't think it was fair to put pressure on me to try to collect a fine, and that they should collect that $50 in the same way that other people had to collect money that is due them * * *.

"After that, Mr. Paley asked me whether Mr. Ross was my superintendent or my foreman, and I told Mr. Paley that he was my superintendent.

"Then Mr. Paley said that it would be perfectly all right for me to retain Mr. Ross as my superintendent as long as I hired a carpenter foreman and paid him 12½¢ more per hour than the usual wage for carpenters, that is, I should pay him $2.37½ an hour rather than $2.25 an hour, and that if I had Mr. Ross as my superintendent and hired a carpenter foreman along with the other carpenters that it would not be necessary for Mr. Ross to rejoin the Carpenters Union.

"Prior to that time, Mr. Paley had told me that the $50 fine had been assessed as dues against Mr. Ross and

he had been suspended from the Union, and then at the point where I just left off he told me that I could retain Mr. Ross as my superintendent and hire a carpenter foreman along with the other Union carpenters and that it would not be necessary for Mr. Ross to rejoin the Union under those circumstances. And I replied that I was willing to do that.

"And when I said that, Mr. Gaussi and Mr. Paley and Mr. Reynolds then said, 'But you still have to make Mr. Ross pay the $50 fine,' and I replied that I would not make him pay the fine, that I did not think it was fair for them to try to require me to collect their obligations, and that is substantially where the conversation ended."

On cross-examination, with reference to the meeting of July 16, respondent was asked if it was not a fact that there was considerable discussion with respect to Mr. Ross's doing some carpentry work himself, but respondent insisted that there was no discussion whatsoever of that subject, and denied that he was told that Ross could be retained as superintendent but could not work with the tools. He testified:

"What Mr. Paley said was as follows, and I recall it very clearly, he said, 'You may, if you wish, retain Mr. Ross as your superintendent, and he can work right along with the Union men.' Now, he didn't say what kind of work, he said, 'work right along with the other men,' those are his exact words, if I would pay a premium and hire a foreman for $2.37½ an hour and pay my carpenters $2.25 an hour, and I said I would do that."

And again:

"Well, see, Mr. Paley asked me whether Mr. Ross was my superintendent or my foreman, and I told him he was my superintendent, and he said, 'If that is so, you may keep him on as your superintendent and he will not have to rejoin the Carpenters' Union and he can work right along with the other men provided you do these other things.'

"Q. That is, provided he didn't work with the tools.

A. No, provided that I hired a foreman at $2.37½ an hour and the other carpenters were to receive $2.25 an hour."

The jury was entitled to believe this testimony and to reject the testimony of Mr. Paley to the effect that he told respondent that Mr. Ross could stay on the job, but he could not use the tools of the trade, and that respondent "would not agree to that." If the jury accepted respondent's testimony, as it manifestly did, it apparently concluded that respondent had agreed to comply with all of the union demands as outlined by Mr. Paley of the Carpenters Union, which demands were coupled with the agreement that Ross might be retained as superintendent without joining or reinstating himself in the Carpenters Union; and that when all of these matters had been agreed upon, he was then told: "But you still have to make Mr. Ross pay the $50 fine." The jury's acceptance of respondent's testimony is a complete answer to the attack on the $250 judgment on the first cause of action, as Ross's membership or reinstatement in the Carpenters Union then became entirely disconnected with the objective of the concerted action of the appellants. It was no more the province of the district court on motion for new trial, than it is the province of this court on appeal, to say that the jury should have disbelieved the detailed testimony of respondent and accepted the more general statement of appellant Paley, that he told respondent: "Mr. Ross could stay on the job, but he could not use the tools of the trade. That Mr. Thompson would not agree to * * *."

Neither appellants nor respondent have cited any authority that may be said to be directly in point. It is true that the rule is stated in 31 Am.Jur. 949, Labor, sec. 231, "Picketing to force an employer to discharge an employee because of delinquency in the payment of his dues is unlawful * * *." However, the only authorities cited in support of this rule are Harvey v.

Chapman, 226 Mass. 191, 115 N.E. 304, L.R.A. 1917 E. 389, and St. Germain v. Bakery & Confectionary W. Union, 97 Wash. 282, 166 P. 665, L.R.A. 1917 F. 824. Contrary to the rule in Nevada, to compel unionization of the employees is not a lawful objective of picketing in either Massachusetts or Washington. (See cases cited in the Massachusetts and Washington cases referred to; also Building Service Employees International Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, supporting the right of each state to determine its own policy in such matters, and recently considered at length by this court in Jensen v. Reno Central Trades & Labor Council, 68 Nev. 269, 229 P.2d 908.)

Perhaps most nearly approaching the present question, though not quite reaching it, is Dorchy v. Kansas, 272 U.S. 306, 47 S.Ct. 86, 87, 71 L.Ed. 248, decided by the U. S. Supreme Court in 1926. In that case the employer mining company paid wages of $3.65 a day for employees under nineteen years of age and $5 a day for those over nineteen. One Mishmash had been paid, without protest, for a number of months at the lower rate, but subsequently demanded additional compensation under the claim that he was entitled to the higher rate. The question of fact had arisen over contradictory entries in the family bible as to the date of his birth. The court said:

"The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose. In the absence of a valid agreement to the contrary, each party to a disputed claim may insist that it be determined only by a court."

Appellants distinguish this case by pointing out that the present case involves no question of a stale claim.

and that the claim was not even disputed because, following the November meeting, Ross actually applied for reinstatement in the Carpenters Union, admitted that he was indebted in the amount of his fine and agreed to pay it. This, however, was under the insistence of Thompson who thought at the time that such action was all that was necessary to permit him to complete the construction of his residence, but who later discovered that it was coupled with the requirement for the payment of the $1,000 penalty involved in the second cause of action. At least twice on cross-examination Ross offered to explain why he refused to pay the fine. On each such occasion the cross-examiner rejected the proffered explanation. Thompson, however, testified that Ross regarded the fine as unfair.[2] In the Dorchy case the reference to the claim as a stale claim arose from the fact that it had been pending for two years. There was no contention that it was barred by limitations nor does any distinction in principle grow out of the fact that Mishmash's claim was against the employer while in the present case it is the union's claim against the employee. In either event both parties had the right to insist that the claim be subject at least to ultimate determination by a court of competent jurisdiction. The purpose of courts is to resolve disputes whether the parties be individuals, corporations, unions or other persons

---

[2]Thompson was asked if he "did anything" with respect to the demand that he make Ross pay the $50 fine. He answered that he urged Ross to reinstate himself with the Carpenters Union, and then, over objection, was permitted to continue: "Well, Mr. Ross told me that the fine of $50 had been unfairly assessed against him and that he wouldn't pay it, and he said that it had been levied against him on a job on a house that he was building for Harold Chisholm and that in the course of the construction of that house they had ordered some union plasterers to do the plastering work. He said that they waited six weeks for union plasterers to arrive on the job and none of them arrived, and they had the job completely held up and finally he had to do the plastering to finish the house for Mr. Chisholm, and for that reason he thought that the fine was unfairly levied and that he wouldn't pay it." It was recognized that this was hearsay and that the jury could draw no inference as to the truth or falsity of Ross's statements as reported by Thompson.

capable of suing and being sued. The Dorchy case on this point cited Guaranty Trust & S. D. Co. v. Green Cove Springs & M. R. Co., 139 U.S. 137, 11 Sup.Ct. 512, 35 L.Ed. 116, rejecting a clause in a mortgage because it attempted "to provide against a remedy in the ordinary course of judicial proceedings, and oust the jurisdiction of the courts, which, as is settled by the uniform current of authority, cannot be done."

In Barile v. Fisher, 197 Misc. 493, 94 N.Y.S.2d 346, plaintiff sought damages from defendant union and others under a complaint from which it appeared that he had been employed by Watson Manufacturing Co. of Jamestown, New York, as a shear operator. Watson Manufacturing Co. operated under an open shop but under contract with the union providing that all employee union members should as a condition of employment remain members of the union in good standing. When the officers of defendant union refused to file non-Communist affidavits, the plaintiff ceased to pay dues because he did not wish to be a member under such conditions. Thereafter he was expelled for failure to pay dues, his employer was notified thereof and, pursuant to the terms of the contract, discharged him. Thereafter the union caused him to be "blacklisted" and prevented him from obtaining employment in other shops in Jamestown. After discussion of New York law justifying acts of the unions having any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining or any other condition of employment, or for the protection from labor abuses, and distinguishing union action not reasonably so connected and thus not freeing the unions from legal responsibility where the objective sought is not a lawful one, the court, in sustaining the liability of the union, said: "* * * The unions which collaborated with the defendant refused to permit the employment of the plaintiff, *not upon the ground that he was a nonunion man or that he was unwilling to join one of the collaborating unions,* but upon the ground that he had

formerly been a member of the defendant union and had withdrawn from it." (Emphasis supplied.) With the jury's apparent acceptance of plaintiff's testimony, this corresponds in theory with the coercive action of these defendants, not to compel Ross's reinstatement as a union man but to compel his payment of the fine theretofore assessed against him. The blacklisting of Barile may have been more drastic than the picketing of Thompson, and the tort there was against the employee rather than the employer, but there is no difference in principle. The Dorchy case is cited by the New York court in support of the statement: "It hardly needs argument to establish that revenge is not a legitimate labor objective."

The dissenting opinion of Mr. Justice Jackson in Trailmobile Co. v. Whirls, 331 U.S. 40, 67 S.Ct. 982, 91 L.Ed. 1328, refers to Dorchy v. Kansas in support of the statement: "Neither may a union use its own power over its members to by-pass the courts." This undoubtedly had reference to the unanimous opinion of the court that for the union "to enforce payment by a strike [of a two year old claim by a former employee against the employer] is clearly coercion."

Thus we see no logical escape from the extension of the principle of the Dorchy case as quoted supra to any case in which a party, not otherwise bound by contract, would be prevented from trying the issues of the disputed money claim in the courts. More than this, a judgment rendered by a court is, generally speaking, subject to appeal. Even though not appealed, execution of that judgment is generally limited by statute to property not exempt from execution. Under varying circumstances, execution may be stayed by a statutory bond, by a supersedeas, or order of court. Enforcement by picketing, strike, boycott, etc., of the collection of a union's claim against a former member, with the immediate and compelling force of such concerted action, would be without respect for any such defenses, exemptions or other rights.

It is clear that from the very beginning of the litigation both parties recognized the importance of characterizing the objective of the concerted action of the defendants. The defendants' answer alleged that a bona fide labor dispute existed between plaintiff and defendants. Plaintiff's reply denied this. The evidence on the issue was, as we have seen, conflicting. The court instructed the jury as to the privilege of the defendants to strike, picket and boycott for a proper labor objective,[3] and as to their liability for damages for their tort if their objective were found to be improper. Specifically the jury was instructed as follows:

"You are instructed that in the field of employer-employee relations, workers and their unions, associations or other organizations, are privileged to cause harm intentionally to an employer or other person by concerted action if both the object and the means of their concerted action are not wrongful. On the contrary, workers, their unions, associations or other organizations, are subject to liability to the employer or other person for damage caused to the employer or other person by such action if either the object or the means of their concerted action is wrongful.

"In this case, there is no contention by plaintiff that defendants used unlawful means to promote their purposes. In this State, peaceful picketing and the peaceful and orderly circulation of 'We Do Not Patronize' lists for the purpose of inducing employment of union labor or the use of union made material are means of fair persuasion and are lawful. But if the picketing or the use of 'We Do Not Patronize' lists are not for the promotion of a lawful or proper purpose, but instead are for the enforcement of demands which labor unions or laborers are not entitled to exact of the employer, then the defendants must compensate plaintiff for all damages suffered by him as the direct and proximate result of such action.

[3] See footnote 1.

"In plaintiff's first cause of action, he charges that the sole purpose of the concerted action taken by the defendants against him was to compel plaintiff to require plaintiff's employee, Robert M. Ross, to pay a fine of $50 to the defendant United Brotherhood of Carpenters & Joiners of America, Local Union No. 971. If the picketing and boycotting of plaintiff's residence project by defendants was for said sole purpose, it then would be for a wrongful purpose and would be unfair persuasion because the purpose is to compel an employer to become a collection agent and to require him to conclude that the assessment by the Carpenters Union was proper without affording the employee the right to have determined by due process whether the fine or debt was legally due. If the jury should find from a preponderance of the evidence that the sole purpose of the concerted action by defendants against plaintiff between July 27, 1948 and November 16, 1948, was to force plaintiff to require said employee Ross to pay a fine to the Carpenters Union, plaintiff should be compensated for all damages proximately caused by defendants' wrongful conduct, under the first cause of action.

"In plaintiff's second cause of action, he charges that the purpose of the concerted action by defendants against him was to require plaintiff to pay the sum of $1,000 to the Childrens Home at Carson City, Nevada. Such a demand upon the plaintiff in itself has no connection whatsoever with a proper or lawful labor objective.

"If the jury should find, from a fair preponderance of the evidence, that the sole purpose of the concerted action taken by defendants in picketing plaintiff's residence construction project and placing plaintiff's name upon a 'We Do Not Patronize' list from November 19, 1948 until December 15, 1948, was to require plaintiff to pay the sum of $1,000 to the Childrens Home at Carson City, Nevada, a judgment should be rendered against the defendants for all damages caused to plaintiff as a

direct and proximate result of such wrongful conduct under the second cause of action."

Appellants assign as error the giving of the foregoing instruction, asserting (1) that it is contradictory, (2) that it assumes the existence of a conspiracy and thus removed such issue from the jury's consideration, (3) that it characterized as wrongful, conduct concerning which the court refused to permit the defendants to introduce evidence, and (4) that it is in effect an instruction to find for the plaintiff on both causes of action "and as such is in direct conflict with all other instructions." We do not find the instruction improper in any of the respects assigned. (1) It contains no contradictory instructions. (2) The reference "to the concerted action taken by defendants" does not disturb other instructions defining conspiracy. (3) The excluded evidence referred to in the exception had to do with Ross's right to appeal from his fine and suspension under the constitution and bylaws of the Carpenters Union. The act characterized as a wrongful objective of the boycott, etc., was the compulsion of the payment of Ross's fine. As a matter of fact the record shows that the witness in question testified definitely that the constitution of the Carpenters Union, a subordinate local union of the United Brotherhood of Carpenters and Joiners of America, provides a method for appeal from a decision of the local union. The offer to which the objection was sustained was of the written constitution and bylaws evidencing such right of appeal, which right was already in evidence before the jury. (4) We are unable to construe the instruction as one "to find for the appellee on both causes of action." It specifically informed the jury of the privilege of the defendants to cause harm intentionally to the plaintiff by concerted action if both the objective and the means of such concerted action were not wrongful, and that peaceful picketing and the circulation of "We Do Not Patronize" list to induce employment of union labor (this, of course, was prior

to the amendment of 1951) were means of fair persuasion and were lawful. The assignment is without merit.

Other instructions are attacked by appellants. These instructions occupy 50 pages of the record and cannot be discussed at length. In particular, appellants attack the instruction defining the liability of a principal for the acts of his agent, the instruction defining the right to recover compensatory damages resulting as a natural and proximate consequence of defendants' wrongful conduct, the instruction defining measure of damage, the instruction limiting the defendants to proof of a lawful objective prior to rather than following the concerted action of the defendants, the instruction as to the right to exemplary or punitive damages, and the instruction as to the extent of proof necessary to establish conspiracy—the last-mentioned instruction being attacked as misleading in not distinguishing between the first and second causes of action. We have carefully examined each of the instructions to which exception is taken and do not find any of them objectionable.

Appellants further assign as error the refusal of the court to give some 34 instructions requested by the defendants. The record on appeal is incomplete, and appellants have moved the court for an order correcting and completing the record by inserting certain documents. The motion is supported by affidavits and upon the ground that the correction and completion of the record will be in accordance with a stipulation of the parties and in furtherance of justice. Under the facts appearing and the certificate issued by the district court in the matter of settling the bill of exceptions, this court would be justified in refusing to consider the matters urged. However, there appears to be some confusion as to the circumstances of the suggested diminution of the record and we have considered such matters in order to avoid any miscarriage of justice.

Appellants assign as error the court's refusal to give instructions D11 to D15, inclusive. These were separate

instructions for directed verdicts in favor of the five individual appellants, respectively, on the first cause of action. Error is likewise assigned in refusing to give instructions D16 to D30, inclusive. These, respectively, were requested instructions for directed verdicts in favor of the Building Trades Council and the nine unions and the five individual appellants on the second cause of action. At the close of the plaintiff's case the trial court on motion of defendants had dismissed from the action a number of the individual defendants, but had then denied the motion to dismiss as to the appellant unions, the personal appellants and appellant Trades Council. Thereafter the requested directed verdicts for dismissal raised the same questions, and it is now insisted that nothing in the record connects any of these appellants (with the possible exception of the Trades Council and Mr. Reynolds, its secretary-treasurer) with the letter of November 28, 1948 requiring that respondent donate $1,000 to the Children's Home or remain on the "We Do Not Patronize" list. We are satisfied, however, that the participation by all of the appellants in the coercive action was either sufficiently shown or could have been properly inferred by the jury from the evidence adduced. In Shore v. Building & Construction Trades Council, 3 Cir., 173 F.2d 678, 682, 8 A.L.R.2d 731, a similar point was raised, and the court said:

"Appellants' final point is that there is no evidence in the record to support the injunction against the Building and Construction Trades Council of Pittsburgh and the International Union of Operating Engineers, Local No. 66, 66-A, 66-B and 66-C. As to the Council, we think that the record shows reasonable cause to believe that it was concerned in the practices here complained of. The A. F. of L. unions for the carpenters, sheet metal workers, electricians and operating engineers are all members of the Council. The business agent for the electricians, in arranging for the meeting with Mr. Ridilla, the general contractor, after the work stoppage,

told him that the Building Trades Council wanted to meet with him. At the meeting the business agents of the above unions were present. We think that the participation of these constituent unions in the conference and work stoppage in the name of the Council is sufficient to show reasonable cause for believing the Council was involved in the matter.

"Similarly the participation of the business agent of the Operating Engineers is sufficient basis for including that union as a party defendant, whether or not there was a direct work stoppage on the part of the shovel operator at the theater job. Mr. Mangold, business agent of the Operating Engineers, was at the September 3 meeting, at which the general contractor and representatives of the trades unions were present."

The present situation was not dissimilar. The affiliation of the defendants with Building Trades Council of Reno and vicinity and the official position of the respective individual defendants are admitted by the pleadings and are more elaborately defined in the various exhibits placed in evidence before the jury. We are satisfied that, like the denial of the motions to dismiss and the denial of the motions for nonsuit (McCafferty v. Flinn, 32 Nev. 269, 107 P. 225), the requests for directed verdicts were properly denied, to the end that these issues might go to the jury.

Error is assigned in the court's refusal to give proposed instruction D31 to the effect that the terms intimidation and coercion "frequently used in the discussion of this question" had no application to the acts committed by the defendants. The issues as defined in the court's instruction heretofore quoted in full and in other instructions given refer to picketing, boycotting, causing intentional harm, circulating "We Do Not Patronize" lists, wrongful conduct, concerted action, fair persuasion, wrongful purpose, and unfair persuasion. The jury was instructed that plaintiff did not contend that unlawful means were used by defendants, and that the

issue was as to the lawfulness or propriety of the purpose or objective of the concerted action. The instruction was properly refused. Requested instructions D32 with reference to threats, D33 with reference to conspiracy, and D34 with reference to extortion, were likewise properly rejected. They have been given consideration, but do not require discussion.

Error is assigned in the court's limitation of cross-examination by defendants of one of plaintiff's witnesses. We find no error or abuse of discretion in the orders complained of. Appellants also assert that this action is equitable in character and that it was error to submit the case to the jury, except for an advisory verdict. It is true that the complaint sought injunctive relief as well as damages. At the time of filing the complaint, plaintiff sought a temporary injunction supported by the pleadings and the affidavit of plaintiff and which was opposed by affidavits submitted on behalf of defendants. The court, in denying the motion for the temporary injunction or injunction *pendente lite* (presented in the form of an order to show cause), said: "It appears * * * that the letter concerning payment of $1,000 to the Children's Home has been retracted, that the Thompson job is no longer on the 'We Do Not Patronize' list, and that all picketing has been withdrawn. * * * The defendants having shown good cause why a temporary injunction should not issue, the application for the same is hereby denied." To all intents and purposes the equitable feature of the case ceased to be an issue and the trial proceeded to its conclusion solely on the claim for damages as pleaded in plaintiff's first and second causes of action. The only issue that went to the jury, so far as the record discloses, was such claim for damages. This was purely a matter of law. The assignment is without merit.

Appellants refer to the prayer of plaintiff's complaint for actual damages upon his first cause of action, for

actual damages upon his second cause of action and for exemplary and punitive damages, and assert that the form of verdict submitted by the trial judge "required the jury to assess damages in a lump sum on each cause of action without reference to the nature of the damages whether compensatory or exemplary." As filled out and returned by the jury the verdict was: "We, the jury, find for plaintiff and against the defendants on his first cause of action and assess his damages at $250.00. We, the jury, find for plaintiff and against the defendants on his second cause of action and assess his damages at $6500.00." It is asserted also that this form of verdict made it impossible for the jury to find in favor of any individual personal defendant or any individual labor union, and in effect instructed the jury that if one person or organization was liable, all were liable. The fallacy of this contention lies in the fact as shown by the record that the trial court handed to the jury a number of forms of verdict. The only form appearing in the record is the one used by the jury. How many forms were submitted or what was covered by the other forms submitted, does not appear. Respectable authority suggests the propriety of a form of verdict which will show separately the compensatory and the punitive damages. The authorities are to the general effect, however, that objections to the form of verdict are deemed waived if no objection is made at the time. 53 Am.Jur. p. 715, Trial, sec. 1035, p. 719, sec. 1039, p. 730, sec. 1054. It may not be raised for the first time on appeal. II Bancroft's Code Practice and Remedies, p. 2026, sec. 1557; Baker v. Peck, 1 Cal.App.2d 231, 36 P.2d 404. In Crystal Dome Oil & Gas Co. v. Savic, 51 Idaho 409, 6 P.2d 155, 156, the court, citing a number of authorities, stated: "In the absence of statute to the contrary, where both actual and punitive damages are, as here, recoverable, a general verdict is sufficient; and, unless requested, the failure to instruct for a distinctive verdict is not fatal error." If appellants desired a specific instruction on punitive damages, they should have requested it. No

request was made for a segregated verdict in the present case and we must find the assignment to be without merit.

Several other matters are discussed in the voluminous briefs. They have all been given consideration but we do not find that a discussion of them is necessary.

There being no error, the judgment and order denying new trial are affirmed with costs.

EATHER and MERRILL, JJ., concur.